BARTLETT, J.
{¶ 1} Defendant-Appellant Oxford Mining Co., LLC ("Oxford Mining"), appeals the separate judgment entries of the Belmont County Court of Common Pleas awarding punitive damages in the amount of $200,000.00, and attorney's fees, expert witness fees, and office expenses in the amount of $168,421.65 to Plaintiffs-Appellees, Karl and Brenda Spires, following the bench trial in this bifurcated negligence action. (10/3/16 J.E., 12/20/16 J.E. respectively.) Oxford Mining also appeals the trial court's denial of its motion in limine to exclude testimony regarding Oxford Mining's falsification of soil content reports to the Environmental Protection Agency ("EPA") memorialized in the judgment entry on punitive damages. For the following reasons, we affirm the judgment entries of the trial court.
{¶ 2} Prior to the bench trial on punitive damages, a jury awarded $100,000.00 in compensatory damages to the Spires on their negligence claim, which was based on the dewatering of the pond on their property, as well as related structural damage to their dock and residence and ecological damage, resulting from coal mining conducted by Oxford Mining on an adjacent property. The judgment on the verdict has been satisfied in full and is not the subject of this appeal.
*720 I. Facts and Procedural History
{¶ 3} The Spires purchased a fourteen-acre property in 1990, which includes 68% of a pond that bordered a five hundred and seventy-six acre mining site in Flushing, Ohio proposed by Oxford Mining in 2001. Oxford Mining declared its intent to strip mine two hundred and twenty-seven acres of Meigs # 9 coal and a three-acre island of Waynesburg # 11 coal, and to auger mine an additional one hundred and eleven acres.
{¶ 4} The Spires' pond was previously a strip mining pit that immediately filled with water in 1972 when another mining company set off charges and inadvertently breached an abandoned and inundated deep underground mine. It was never determined whether the mine that was breached was identified on the 1926 deep mine map employed by the mining company in 1972 or was another mine that was not properly mapped.
{¶ 5} Because of Oxford Mining's desire to mine within five hundred feet of a mapped deep mine, the company was required to submit a mine avoidance plan. The plan called for test drilling to begin when mining approached one hundred feet of a mapped mine.
{¶ 6} Due to the manner in which the Spires' pond was created, Oxford Mining's reliance on the same 1926 deep mine map employed in 1972, and the proximity of the proposed mining to both the pond and a mapped deep mine roughly 200 to 300 feet from the pond, the Spires objected to the mining permit sought by Oxford Mining through the Ohio Department of Natural Resources, Division of Mineral Resources Management ("ONDR"). The Spires fought the issuance of the permit from the initial hearing at the township hall, through the administrative process, all the way to an appeal before this Court.
{¶ 7} In Spires v. Division of Mineral Resources Management , 7th Dist. No. 06BE54, 2007-Ohio-5038, 2007 WL 2781266, the Spires sought denial of the requested permit in its then form, or, in the alternative, that a modification be made to expand the test drilling parameters to within five hundred feet of a mapped underground mine to ameliorate the inaccuracies in the 1926 deep mine map. Following a thorough examination of the facts presented, we concluded that the Commission's decision to grant the permit was not arbitrary, capricious, or inconsistent with law. Id. at ¶ 59.
{¶ 8} The Commission based its decision on the fact that only a three acre ridge in the northeast corner near the pond was being stripped, and that the remainder of the corner was only being auger mined; however, it recognized that the permit covered the entire parcel of land regardless of Oxford Mining's current plan. The Commission reasoned that the mine avoidance plan designed by Oxford Mining was an adequate safeguard against unanticipated mine intrusion, citing the drill testing plan, the blasting program, and the direction of movement across the land. The Commission dismissed the creation of the Spires' pond in 1972 as a single anomaly which did not invalidate the 1926 deep mine map. Finally, the Commission opined that even if Oxford Mining were to intercept an inundated deep mine, it was likely that the pond would not be dewatered or that the dewatering would be temporary. Id. at ¶¶ 17-18.
{¶ 9} The state permit contained regulations and guidelines delineating both the authorized types of mining (surface, highway, auger) as well as the acceptable locations for the various types of mining on the property. The permit contained specific mine avoidance drill plan regulations and authorized auger mining only in certain *721 locations. In addition to the restrictions set forth in the permit, the Mine Safety and Health Administration ("MSHA") also provided a ground control map for the avoidance of underground abandoned mines.
{¶ 10} On December 27, 2010, Oxford Mining hit a void in a 250 by 250 foot pit with 80 foot walls ("Flushing pit No. 3") that resulted in the dewatering of the Spires' pond, as well as property damage to the dock and other structures. Neither party proved the actual nature of the void at trial, only that it was unmapped.
{¶ 11} In addition to the highwall mining foreman, Richard Dessicker, four other employees of Oxford Mining were in Flushing pit No. 3 when water from the Spires' pond flooded the pit. Two men were working on loaders and two men were working on the highwall mining machine. No one was injured, however the employee's pants and boots were soaked. (Wallace and Dessicker Tr., pp. 57-61, Trial Tr., pp. 176-179.)
{¶ 12} Despite federal regulations that require notification to the MSHA within fifteen minutes of an "inundation", more than an hour passed while machinery and equipment were removed from the pit. (Wallace and Dessicker Tr., pp. 61-64.) Upon receipt of the incident report, the MSHA issued an order to stop all business in the pit. (Trial Tr., pp. 54-55.) According to William Alloway, Oxford Mining's safety manager, the dewatering of the Spires' pond did not constitute an "inundation" because workers were still able to work in the pit. (Trial Tr., p. 72-73.)
{¶ 13} When the stop work order was lifted, Oxford Mining immediately began working to plug the holes and the pond was restored to its original water level within six weeks. (Wallace and Dessicker Tr., pp. 38-40.) Despite expert testimony that the dewatering caused hundreds of thousands of dollars of property damage to the dock and the residence, as well as millions of dollars of loss of fish and damage to the eco-system, the jury awarded the Spires compensatory damages in the amount of $100,000.00.
{¶ 14} Oxford Mining was cited by the MSHA for failing to follow the ground control plan, as it ignored drilling requirements in advance of auger mining. However, the MSHA inspector found that the likelihood of injury was not significant or substantial, despite Oxford Mining's deviation from the plan. The MSHA inspector characterized Oxford Mining's conduct as "low negligence." (Trial Tr., p. 299-304.)
{¶ 15} Oxford Mining was also cited by the ODNR for highwall auger mining in an area not approved for highwall mining. (Trial Tr., p. 61.) Charles Borg, a surveyor employed by the Spires, testified at the jury trial that Oxford Mining exceeded the territorial limits for highwall mining by 5,325 cubic feet, and mined coal with a value of $266,434,83 from the unauthorized area. Mr. Borg died prior to the bench trial, but the parties stipulated to the admission of a transcript of his testimony from the jury trial.
{¶ 16} Gregory Honish, Oxford Mining's Vice President of Mining Operations and Business Development at the time of the pond-dewatering, and President and General Manager at the time of the bench trial, conceded that the plan created by Chad Wallace, Oxford Mining's surveyor and CAD draftsman, exceeded the authority granted by the permit. Honish admitted that "[t]here was a plan put together that showed highwall mining to go beyond what was specified on the permit." (Trial Tr., pp. 82, 86-89.)
{¶ 17} Honish explained that Oxford Mining did not exceed the territorial boundaries of the permit, but, instead, violated the territorial limits for auger mining *722 within the boundaries authorized in the permit. Despite his efforts to diminish Oxford Mining's decision to exceed the limitations required by the state permit, Honish admitted that the company should have filed an amendment or sought a modification from the state. However, he testified that amendments and modifications to mining permits are commonly granted after some discourse with the state. (Trial Tr., pp. 81-83, 86-89, 125-126.)
{¶ 18} Despite Honish's testimony that Oxford Mining "absolutely" took into consideration the Spires' concerns in developing its plan, the man who drafted the plan was never told about the Spires' specific fears. Wallace testified that damage to adjacent property is always a concern when designing a plan, but conceded that Honish never informed him about the Spires' specific doubts regarding the accuracy of the 1926 map or their efforts to require test drilling within five hundred feet of the pond. (Wallace and Dessicker Tr., pp. 21, 43-45.)
{¶ 19} Alloway admitted that the company departed from the ground control plan put in place by the MSHA, which was designed for the avoidance of underground abandoned mines. Alloway further conceded that he was not even aware that there were separate requirements in place from both the state and federal governments. (Trial Tr., p. 21.) Wallace also testified that he was not aware at the outset of the project that separate plans were issued by the state and federal governments, but said that the plans were similar in many respects. (Wallace and Dessicker Tr., pp. 27, 44.)
{¶ 20} Next, testimony was offered at the bench trial regarding the falsification of thousands of EPA reports by Oxford Mining employees. Oxford Mining filed a motion in limine to exclude the testimony, arguing that it was unrelated to dewatering of the Spires' pond, and renewed the motion at the bench trial to preserve the issue on appeal. Twenty-one of the falsified EPA reports related to the soil content at Flushing pit No. 3, two of which were the December 2010 and January 2011 reports.
{¶ 21} Sherri Miller, an employee of Oxford Mining at all time relevant to the complaint, testified that she began falsifying soil content reports at the direction of her supervisor, Wayne Light, the Director of Environmental Compliance, but that she received no additional compensation for her illegal actions. She further testified that the information falsely reported to the EPA bore no relation to the damage caused to the Spires' pond and was completely unrelated to the December 27, 2010 incident.
{¶ 22} Light testified that his responsibilities at Oxford Mining included reporting the discharge from various sediment ponds to the EPA. Although he was told by supervisors that his numbers needed to stay in compliance with Ohio law, he stated that he did not take that to mean that he should falsify records. He testified that he acted of his own accord in falsifying documents and instructing Miller to falsify documents. He further stated that he was not compensated for his illegal actions by Oxford Mining. When Light confessed to Honish in April or May of 2011 that he was falsifying reports, Honish told him that "[you] can't do that" and instructed him to speak to the company's attorney. (Trial Tr., p. 99.)
{¶ 23} Amended reports were submitted to the EPA roughly four months later after the EPA issued a Section 308 letter requesting additional information regarding the soil content reports. Both Light and Oxford Mining were convicted for violations of the Clean Water Act in the United State District Court for the Southern District of Ohio. Light was convicted *723 of a knowing violation, resulting in a felony conviction, 33 U.S.C. 1319(c)(2), while Oxford Mining was convicted of a negligent violation, resulting in a misdemeanor conviction, 33 U.S.C. 1319(c)(1).
{¶ 24} The sole expert testimony offered at the bench trial was provided by Jack Spadaro, a retired federal mine safety official. He opined that Oxford Mining knew that the possibility of inundation was great but repeatedly ignored the territorial limitations and test drilling requirements of the permit and the ground control plan, which were put in place for the very purpose of averting underground voids. He characterized Oxford Mining's actions as intentional departures from the state limits for highwall mining intrusion into areas where known abandoned mines were present, undertaken without the safety precautions that had been prescribed in the state permit and federal ground control plan. Spadaro concluded that Oxford Mining deliberately ignored known risks and potential hazards in the coal mining operation in Flushing pit No. 3 and that its actions created an extreme hazard to its workers. (Trial Tr., p. 286-290.)
{¶ 25} Following the bench trial, the parties submitted proposed findings of fact and conclusions of law. Based upon the evidence adduced at the bench trial, the trial court awarded punitive damages in the amount of $200,000.00. The trial court based its finding of a "conscious disregard for the rights and safety of other persons, which had a great probability of causing substantial harm" on the state and federal citations issued to Oxford Mining for: (1) the intentional failure to follow the highwall mining/auger plan by repeatedly making highwall mining cuts beyond the area allowed for highwall mining, and (2) the intentional failure to follow the federal drill plan that required test drilling in advance of auger mining.
{¶ 26} The trial court further relied on Spadaro's testimony that Oxford Mining's intentional disregard of state and federal limitations created a great and substantial risk to employees in Flushing pit No. 3. The trial court cited Oxford Mining's decision to wait almost ninety minutes to report the incident to the MSHA, choosing instead to remove the machinery from the pit prior to the issuance of the "stop work" order.
{¶ 27} In addition, the trial court cited upon the federal convictions of Light and Oxford Mining that resulted from the thousands of fraudulent reports submitted to the EPA regarding soil content, which occurred from approximately 2009 to September 2011. The trial court found that Light was acting within the course and scope of his employment when he falsified reports and/or instructed other employees to submit false reports, wholly for the benefit of Oxford Mining. Finally the trial court cited the value of the coal derived from the use of unauthorized highwall auger mining to establish the motive for Oxford Mining's actions.
{¶ 28} Following the judgment entry awarding punitive damages, the trial court conducted a hearing on the Spires' motion for attorney's fees and litigation expenses. At the hearing, the trial court accepted testimony from the Spires' trial counsel and expert testimony from Attorney Charles H. Bean. Oxford Mining offered no testimony at the hearing, but argued that the attorney's fees attributable to the punitive damages claim were easily divisible from the attorney's fees attributable to the negligence claim. Oxford Mining also objected to an award of expert witness fees as a part of the litigation expenses.
{¶ 29} In the judgment entry awarding attorney's fee and expert witness fees the trial court concluded that evidence supporting the negligence claim and the punitive *724 damages claim were intertwined. The trial court reasoned that "one act by [Oxford Mining] was the basis for the entire case," and that the "evidence presented in each trial was developed simultaneously and essentially the same witnesses and evidence were presented twice." (12/20/2016 J.E., p. 3.)
II. Analysis
Assignment of Error No. I: The trial court erred in awarding Appellees punitive damages as there was no evidence that Appellant acted with the requisite malice and because the trial court considered and relied upon inadmissible and irrelevant evidence that had no relation to the damage to Appellees' property when it awarded punitive damages.
{¶ 30} In a tort action, a plaintiff must prove the defendant acted with malice, aggravated or egregious fraud, oppression, or insult in order to recover punitive damages by clear and convincing evidence. Bosak v. Kalmer , 7th Dist. No. 01 CA 18, 2002-Ohio-3463, 2002 WL 1483884, ¶ 34, appeal not allowed , 97 Ohio St.3d 1468, 2002-Ohio-6347, 779 N.E.2d 236, citing R.C. 2315.21. "The purpose of punitive damages is to punish the offender and set an example in order to deter others from similar behavior." Id. "It is the egregiousness of the defendant's conduct that determines the appropriateness of an award of punitive damages." Id.
{¶ 31} The Ohio Supreme Court has defined the "actual malice" needed to prove punitive damages as: (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. The latter category of actual malice includes "extremely reckless behavior revealing a conscious disregard for a great and obvious harm." Id. at 335, 512 N.E.2d at 1175.1 Malice may be inferred from "reckless, wanton, willful or gross" behavior. Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 37, 543 N.E.2d 464.
{¶ 32} Whether actual malice exists is a question for the trier of fact. Buckeye Union Ins. Co. v. New England Ins. Co. (1999), 87 Ohio St.3d 280, 720 N.E.2d 495 ; R.C. 2315.21(C)(1). "The same standard of review is employed to assess the weight of evidence whether the finding is for compensatory damages or the elements necessary to justify an award of punitive damages." Bosak at ¶ 36. Factual determinations will not be overturned as long as they are supported by "some competent, credible evidence going to all the essential elements of the case." Id. citing C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
{¶ 33} Before addressing the weight of the evidence supporting the punitive damages award, we must first determine whether the evidence of fraudulent reporting was properly considered by the trial court. Oxford Mining also challenges the trial court's admission into evidence of the value of the coal derived from highwall mining in unauthorized areas provided by Charles Borg. It is important to note that there is no transcript of Borg's testimony from the jury trial in the record, so it is not clear whether Oxford Mining objected to this testimony at the jury trial in order to preserve the issue on appeal. Oxford Mining's counsel stipulated to the admission of the jury trial transcript at the bench trial.
{¶ 34} The threshold test of admissibility is whether evidence is relevant. Evid. R. 402. "Relevant evidence" is defined as "evidence *725 having any tendency to make the existence of a fact that is of consequence to determination of the action more probable or less probable that it would be without the evidence." Evid. R. 401.
{¶ 35} Decisions involving the admissibility of evidence are reviewed for an abuse of discretion. State v. Hancock , 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032. For an abuse of discretion to have occurred, the trial court must have taken action that is unreasonable, arbitrary, or unconscionable. State ex rel. Beacon Journal Publishing Co. v. Akron , 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 59.
{¶ 36} The Spires relied on the evidence of fraudulent reporting to establish a culture of corruption at Oxford Mining. Oxford Mining argues that the fraudulent reporting was limited to soil content, which is a subject completely unrelated to the dewatering of the Spires' pond based upon the testimony at the bench trial.
{¶ 37} While the fraudulent reporting had no causal connection to the dewatering of the Spires' pond, it nonetheless established a pattern of noncompliance with governmental requirements at Oxford Mining. Because Honish attempted to diminish the significance of Oxford Mining's departure from the requirements of the state permit and federal ground control plan, the fraudulent EPA reports provided additional evidence that Oxford Mining intentionally subverted governmental regulations in other areas of the business as well. Accordingly, we find that the trial court did not abuse its discretion when it admitted evidence of fraudulent reporting.
{¶ 38} Next, Oxford Mining contends that the trial court erred in considering the value of the coal taken by unauthorized means from Flushing pit No. 3. Oxford Mining argues that the coal was not taken from the Spires' property and that it was removed from property within the territorial boundaries of the state permit. Oxford Mining further asserts that the property owners were compensated for all of the coal taken from the property.
{¶ 39} Assuming that this issue was preserved for appeal, we find that the trial court did not abuse its discretion when it considered the value of the coal derived from unauthorized highwall mining. The value of the coal establishes that Oxford Mining derived a significant benefit from its deliberate deviation from the state permit and the federal ground control plan. The evidence is relevant to whether Oxford Mining acted with a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm for the purpose of additional profit. Accordingly, the trial court's decision to consider the evidence was not unreasonable, arbitrary, or unconscionable.
{¶ 40} Turning to the evidence in its totality, we find that competent, credible evidence supports the trial court's finding that Oxford Mining acted with malice, that is, a "conscious disregard for the rights and safety of other persons, which had a great probability of causing substantial harm." Preston, supra . With respect to the element of "conscious disregard for the rights of other persons", the evidence established that the Spires were relentless in their efforts to convince Oxford Mining and the ODNR that the presence of unmapped mines threatened their property. Despite their efforts, Wallace testified that Honish never informed him of the Spires' concerns prior to implementing the plan.
{¶ 41} Of greater import, all of Oxford Mining's representatives admitted that the plan exceeded the limitations set forth in the state permit, and that Oxford Mining employees failed to follow the drilling requirements *726 set forth in the state permit and federal ground control plan. Oxford Mining engaged in repeated departures from the mine avoidance plan submitted to the state, the very limitations upon which the Commissioner relied to ameliorate the Spires' fears of dewatering. The Commissioner specifically identified the drill plan as creating an adequate safeguard against unanticipated mine intrusion. Moreover, to the extent that Honish's testimony suggested that it was not uncommon in the industry to exceed state permit limitations, the evidence of fraudulent reporting to the EPA demonstrated that Oxford Mining engaged in noncompliance with governmental requirements in more than one area of their business.
{¶ 42} Although the MSHA concluded that no injury or illness resulted from Oxford Mining's actions, and characterized them as "low negligence", Ohio law includes the conscious disregard for the rights, not just the safety, of other persons. Here, Oxford Mining was on notice of the great probability of substantial harm to the property owned by the Spires. The company nonetheless repeatedly departed from requirements put in place to protect the Spires' rights.
{¶ 43} Finally, the Borg testimony established that Oxford Mining received a substantial benefit from exceeding the limits of highwall mining under the state permit. Therefore, the fact finder could conclude that Oxford Mining ignored the permit issued by the regulatory agency for the purpose of additional profit.
{¶ 44} Accordingly, we find that the trial court did not abuse its discretion in considering the evidence regarding the fraudulent EPA reports or the value of the coal extracted by way of unauthorized highwall auger mining. That evidence lends credibility to the trial court's finding that Oxford Mining acted with conscious disregard to the Spires' rights, which had a great probability of substantial harm. Likewise, we find that there is competent credible evidence to support the award of punitive damages in this case. As a consequence, we find that Oxford Mining's first assignment of error has no merit.
Assignment of Error No. II: The trial court erred in awarding attorney's fees for the underlying tort case as well as awarding litigation expenses which included the cost of Appellees' expert witnesses.
{¶ 45} A trial court has discretion to determine the appropriate amount of attorney's fees to award in each case; therefore, a fee award is not generally overturned on appeal absent an abuse of discretion. Bittner v. Tri-County Toyota, Inc. , 58 Ohio St.3d 143, 146, 569 N.E.2d 464 (1991). An abuse of discretion is more than mere error of law or judgment; rather, it involves an unreasonable, arbitrary, or unconscionable decision. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It is for the trial court to ascertain whether the rate per hour and the number of hours expended were reasonable and to work up or down from that number using various factors as the court sees fit. Bittner , 58 Ohio St.3d 143, 569 N.E.2d 464. "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." Id. at 146, 569 N.E.2d 464.
{¶ 46} "Ohio has long adhered to the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." Wilborn v. Bank One Corp. , 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7. An exception to this rule exists when punitive damages are awarded in tort cases involving fraud, insult, or malice.
*727 Columbus Fin., Inc. v. Howard (1975), 42 Ohio St.2d 178, 183, 327 N.E.2d 654, citing Roberts v. Mason (1859), 10 Ohio St. 277. If punitive damages are proper, reasonable attorney fees may be awarded as an element of compensatory damages. Galmish v. Cicchini (2000), 90 Ohio St.3d 22, 35, 734 N.E.2d 782. An award of attorney fees may stem from an award of punitive damages, but "the attorney-fee award itself is not an element of the punitive-damages award." Neal-Pettit v. Lahman , 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 16.
{¶ 47} While it is true that a trial court must award fees "only for the amount of time spent pursuing the claim for which fees may be awarded," this is only so where it is possible to separate claims in such a manner. Bittner , 58 Ohio St.3d at 145, 569 N.E.2d 464. With respect to a multi-count complaint, the United States Supreme Court has recognized:
In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
Hensley v. Eckerhart (1983), 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40.
{¶ 48} Following the jury trial on December 3 and 4, 2015, several months of additional discovery were scheduled before the bench trial on the issue of punitive damages was held on July 26 and 27, 2016. Oxford Mining contends that a clear line of demarcation exists between the attorney's fees generated litigating the negligence claim and the attorney's fees generated litigating the punitive damages claim. Because the trial was bifurcated, Oxford Mining asserts that any attorney's fees billed from the commencement of the second phase of discovery through the entry of judgment in the punitive damages trial should be awarded to the Spires. Oxford Mining reasons that the attorney's fees billed prior to the commencement of the second phase of discovery are subject to the American rule.
{¶ 49} Virtually every fact adduced at the jury trial was relevant to the trial court's punitive damages award. In other words, the same evidence advanced in support of the Spires' negligence claim was essential to proving their punitive damages claim. Oxford Mining appears to believe that any attorney's fees generated during the negligence phase of this case cannot be recouped by the Spires. To the contrary, all of the attorney's fees generated during the negligence phase are recoupable if there exists a common core of facts advanced in both phases of the trial.
{¶ 50} Here, Oxford Mining relies on a temporal line to divide attorney's fees. The company makes no effort to divide the fees based upon the specific work performed. Because there is an indivisibility of the facts adduced during the negligence phase and the punitive damages phase of this case, we find that the trial court did not abuse its discretion in awarding all of the attorney's fees generated in this case.
{¶ 51} Finally, Oxford Mining argues that the trial court erred in granting the Spires' motion for expert witness fees. Oxford Mining argues that R.C. 2315.21(D)(1)(c) allows for attorney's fees to be awarded in conjunction with a punitive damages award, but does not allow for an award of litigation costs. Oxford Mining cites a number of Ohio statutes that specifically allow for an award of costs and/or *728 expenses, reasoning that the absence of similar language in R.C. 2315.21 prohibits such an award.
{¶ 52} However, we recently held that litigation expenses in the form of expert witness fees can be considered by the trial court when calculating attorney's fees where there is prior finding that punitive damages and attorney's fees were warranted. Premier Therapy, LLC v. Childs , 7th Dist., 2016-Ohio-7934, 75 N.E.3d 692, ¶ 176, appeal not allowed sub nom. Premier Therapy, L.L.C. v. Childs , 150 Ohio St.3d 1408, 2017-Ohio-6964, 78 N.E.3d 909, ¶ 176. In that case, we reasoned that R.C. 2315.21 is not the basis for an award of attorney's fees, but, merely, excludes them from the cap on damages. Id. Therefore, we reject Oxford Mining's argument that litigation expenses may not be awarded based upon the plain language of R.C. 2315.21.
{¶ 53} Further, we find that the trial court did not abuse its discretion in awarding expert witness fees. Oxford Mining contends that the trial court's failure to articulate its rationale for the award reveals an abuse of discretion. To the contrary, we have recognized that expert witness fees fall under the rubric of attorney's fees, and, therefore, the award of expert witness fees is not unreasonable, arbitrary, or unconscionable.
{¶ 54} The trial court acted reasonably in awarding attorney's fees and litigation costs to Appellees. Therefore, we find that Oxford Mining's second assignment of error challenging the award for attorney's fees and litigation expenses has no merit.
III. Conclusion
{¶ 55} In summary, we find that the trial court did not abuse its discretion in admitting evidence of Oxford Mining's fraudulent reporting to the EPA and the value of the additional coal derived from unauthorized highwall drilling, because that evidence supported the conclusion that Oxford Mining acted in conscious disregard of the Spires' rights. We further find that there is competent, credible evidence in the record that Oxford Mining acted with a conscious disregard for the Spires' rights and its actions created a great probability of causing substantial harm. Finally, we find that the trial court did not abuse its discretion in awarding attorney's fees and expert witness fees in this case. For the foregoing reasons, the judgment entries of the trial court are affirmed.
Waite, J., concurs.
Robb, P.J., concurs.