[Cite as *Windsor Med. Ctr., Inc. v. Time Warner Cable, Inc.*, 2021-Ohio-158.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

WINDSOR MEDICAL CENTER, INC.

     Plaintiff-Appellee

-vs-

TIME WARNER CABLE, INC. DBA
SPECTRUM BUSINESS, ET AL

     Defendants-Appellants

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. Patricia A. Delaney, J.
Hon. Craig R. Baldwin, J.

Case No. 2020CA00085

O P I N IO N

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Appeal from the Stark County Court of Common Pleas, Case No. 2018CV02199 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | January 20, 2021 |

APPEARANCES:

| For Plaintiff-Appellee | For Defendants-Appellants |
|---|---|
| SCOTT P. SANDROCK | ROBERT W. BURGER |
| ELIZABETH SHIVELY BOATWRIGHT | CAITLIN R. THOMAS |
| Brennan, Manna & Diamond, LLC | Thompson Hine, LLP |
| 75 E. Market Street | 3900 Key Center |
| Akron, Ohio 44308 | 127 Public Square |
| | Cleveland, Ohio 44114 |

*Hoffman, P.J.*

{¶1} Defendants-appellants Time Warner Cable, Inc, dba Spectrum Business, et al. ("Spectrum") appeal the February 12, 2020 Judgment Entry entered by the Stark County Court of Common Pleas, which denied their motion for judgment notwithstanding the verdict. Plaintiff-appellee is Windsor Medical Center, Inc. ("Windsor Medical").

## STATEMENT OF THE FACTS AND CASE

{¶2} Windsor Medical is a family-owned business, which operates a skilled nursing and senior living center in North Canton, Stark County, Ohio. Spectrum is engaged in the business of providing telephone, internet, cable, and other technology services to individuals and businesses. Windsor Medical contracted with Spectrum to provide telephone, internet, and cable television services for its office and residents. The parties' business relationship dated back to at least 2012.

{¶3} Sometime in 2015, disputes arose between the parties over charges for international calls and double billing for internet service. Windsor Medical's attempts to resolve the disputes were unsuccessful.

{¶4} On November 14, 2018, Windsor Medical filed a complaint against Spectrum, asserting claims of fraud and violations of Ohio's Deceptive Trade Practices Act (R.C. Chapter 4165). Spectrum filed an answer on December 12, 2018. The parties participated in mediation, which proved unsuccessful. A second mediation was scheduled, but ultimately cancelled.

{¶5} On October 21, 2019, a week before trial, Spectrum filed a motion for leave to file a counterclaim as well as a motion to continue. The trial court denied both motions. The matter proceeded to jury trial on October 28, 2019.

*International Service*

{¶6}    Seth Swallen, who worked in administration and information technology for Windsor Medical during the time period at issue, testified regarding the contract negotiations and discussions he had with Spectrum regarding international phone service.    When Spectrum's sales representative Patrick Harrison asked if Windsor Medical wanted Spectrum, Time Warner at the time, to provide long distance and international calls, Swallen expressly declined international service.   Harrison advised Swallen he would make sure international service was not available at Windsor Medical.

{¶7}    Swallen recalled, in September, 2015, Windsor Medical received a bill from Spectrum which included a charge labeled "international usage" with a service date of August 5, 2015.    Swallen immediately contacted Spectrum about the charge.    At Spectrum's direction, Swallen verified Windsor Medical had taken the appropriate measures with its equipment to prevent international calls.  The following month, Windsor Medical received a bill from Spectrum which still included the international service charge totaling $7,753.62, with taxes and fees.   Swallen contacted Harrison as well as a risk management specialist at Spectrum regarding the bill.    Swallen indicated his belief Windsor Medical was owed a credit for the international charges as it had requested the phone service not include an international component.

{¶8}    Several months later, Spectrum acknowledged it owed Windsor Medical a credit for the international service charges and such would be forthcoming.   Although Windsor Medical remained current on all undisputed charges, it continued to receive past due notices from Spectrum.   Swallen made multiple calls to Spectrum, attempting to resolve the issue.   He was repeatedly placed on hold and transferred from one

department to another, never speaking to anyone with authority to resolve the matter. On December 28, 2015, Swallen emailed Spectrum regarding the charges and requesting a manager with authority contact him. A month later, on January 28, 2016, Swallen received an email from Ar'Qua Welch, a collections agent with Spectrum, advising him Spectrum had issued a partial credit of $2,894.99, and a tax credit of $743.93.

{¶9} On February 4, 2016, Swallen emailed Welch, Harrison, and account representative Armand DiDonato, requesting the balance of the promised credit for the international charges. Welch responded, explaining she could not issue the credit and directed Swallen to another department. The other department was unable to resolve the issue. Windsor Medical continued to pay all undisputed charges on its accounts.

{¶10} On February 11, 2016, Windsor Medical received a notice from Spectrum, advising the phone system would be shut off if the remaining balance was not paid. Swallen contacted DiDonato, who advised Swallen to pay the balance if he did not want Windsor Medical's service shut off. Swallen paid the balance to avoid a disruption in phone service. Windsor Medical never received the full promised credit for the international service charges.

{¶11} Subsequently, in January, 2017, Windsor Medical received a bill from Spectrum which included a second international service charge, totaling $3,214.43, with taxes and fees. Windsor Medical contacted Spectrum regarding the charge. Spectrum advised Windsor Medical to check the security recommendations. Ultimately, Windsor Medical paid the charges to avoid termination of its phone service. Spectrum never credited Windsor Medical for the second international service charge.

*Internet Accounts*

{¶12} In the fall of 2015, Harrison approached Swallen about moving Windsor Medical's internet service from a regional account to a national account, promising better internet speed at a lower rate. Swallen accepted the offer and signed a new internet contract in December, 2015. Swallen understood Harrison would have the old service disconnected when the new service was up and running. Although the new service required updated equipment, Harrison promised the switch would be "turnkey" and he would handle everything.

{¶13} Harrison never notified Swallen the new service was ready. Windsor Medical began receiving separate bills for each of the internet accounts. When Swallen contacted Harrison about the double billing, Harrison informed Swallen he (Swallen) would need to cancel the old account as Harrison was not permitted to do so. Swallen attempted to cancel the account, but was unsuccessful. The Spectrum representative advised Swallen she could not locate the account with the account number Harrison had provided to Swallen. Meanwhile, Windsor Medical continued to receive separate bills for each of the internet accounts.

{¶14} On June 2, 2016, Harrison emailed Swallen, acknowledging there should only be one internet account and inquiring whether Swallen had cancelled the first account. Swallen advised Harrison he was getting the "runaround" and had been unable to cancel the account. Harrison put Swallen in touch with DiDonato. When Swallen and DiDonato met to discuss the situation, DiDonato informed Swallen Harrison was no longer working for Spectrum and Windsor Medical was not the only business Harrison had convinced to move from regional to national accounts in order to improve his sales

numbers. DiDonato apologized and promised to correct the situation. In addition, DiDonato, like Harrison, indicated the new service would require new equipment. Although Windsor Medical was billed for two internet services, Spectrum never installed the required equipment or updated the service in any manner.

{¶15} Almost a year later, in April, 2017, DiDonato emailed Swallen, inquiring whether Windsor Medical had two internet connections. DiDonato indicated he would have to engage a national account team to resolve the billing issue with the second internet account. DiDonato explained the original internet account would need to be disconnected to avoid double billing and he would get the paperwork completed. DiDonato added he "was never notified by anyone that the service needed disconnected to prevent double billing." Tr. Vol. I at 183.

{¶16} Despite ongoing discussions to resolve the issues, Windsor Medical received multiple threats of termination of phone service from Spectrum. At one point in 2017, a third-party collection agency came to Windsor Medical and advised the accounts payable individual the telephone service would be shut off that day if payment was not made. Windsor Medical paid Spectrum $2,165.96, to avoid disruption of its phone service.

{¶17} Nonetheless, on May 4, 2017, Spectrum shut off the phone system at Windsor Medical. When Swallen arrived at the facility, he was met with a nursing staff in a state of panic. Nurses were unable to send and receive medication and lab orders. Family members of the residents arrived, concerned they were unable to reach their loved ones on the phone. DiDonato eventually returned Swallen's calls and emails. He stated Windsor Medical's account was not in a non-pay status and suggested Swallen contact

fiber support. Fiber support indicated the phone system was disconnected for nonpayment. In a May 5, 2017 email, DiDonato, acknowledging the corrections which needed to be made on the account, advised Swallen the fastest way to restore service was to pay the past due amount. Windsor Medical paid the past due balance.

{¶18} Months passed without resolution. Then, in August, 2017, Swallen received an email from Spectrum's collections department, demanding Windsor Medical pay $1,129.48, to avoid another phone shut off.

{¶19} After hearing all the evidence and deliberating, the jury found in favor of Windsor Medical on its fraud claim. The jury awarded Windsor Medical $22,000.00, in compensatory damages and $225,000.00, in punitive damages. The jury also awarded Windsor Medical reasonable attorney fees. The jury found in favor of Spectrum on Windsor Medical's claim for deceptive trade practices.

{¶20} On November 25, 2019, Spectrum filed a Motion for Judgment Notwithstanding the Verdict, or, in the alternative, Remittitur. Therein, Spectrum asserted the economic loss doctrine barred Windsor Medical's fraud claim as such claim stemmed from Spectrum's alleged performance or non-performance under the parties' contract. Also, on November 25, 2019, Windsor Medical filed a Motion for Prejudgment Interest.

{¶21} Via Judgment Entry filed February 12, 2020, the trial court denied Spectrum's Motion for Judgment Notwithstanding the Verdict. The trial court found a reasonable juror could conclude Spectrum's conduct went beyond a mere breach of contract. The trial court further found the economic loss doctrine did not bar Windsor Medical's fraud claim. The trial court concluded Windsor Medical presented sufficient

evidence to support the jury's finding of fraud and to support the jury's award of punitive damages.

**{¶22}** It is from this judgment entry Spectrum appeals, raising the following assignment of error:

THE TRIAL COURT ERRED IN DENYING SPECTRUM MID-AMERICA, LLC'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT. (FEBRUARY 12, 2020 JUDGMENT ENTRY.)

STANDARD OF REVIEW

**{¶23}** Civil Rule 50(B) governs motions for judgment notwithstanding the verdict (JNOV). When ruling on a motion for JNOV, a trial court applies the same test as in reviewing a motion for a directed verdict. *Ronske v. Heil Co.*, 5th Dist. Stark No. 2006-CA-00168, 2007-Ohio-5417; *Pariseau v. Wedge Products, Inc.*, 36 Ohio St.3d 124, 522 N.E.2d 511 (1988). In reviewing a motion for JNOV, courts do not consider the weight of the evidence or the witness credibility; rather, courts consider the much narrower legal question of whether sufficient evidence exists to support the verdict. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 693 N.E.2d 271 (1998). In other words, if there is evidence to support the nonmoving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied. *Osler v. City of Lorain*, 28 Ohio St.3d 345, 504 N.E.2d 19 (1986). Appellate review of a ruling on a motion for JNOV is de novo. *Midwest Energy*

*Consultants, L.L.C. v. Utility Pipeline, Ltd.*, 5th Dist. Stark No. 2006CA00048, 2006-Ohio-6232.

I.

**{¶24}** Spectrum sets forth three grounds upon which it predicates its assertion the trial court erred in denying its motion for judgment notwithstanding the verdict. First, Spectrum contends the economic loss doctrine barred Windsor Medical's fraud claim as such claim sounded in contract. Next, Spectrum argues, assuming the economic loss doctrine did not bar Windsor Medical's fraud claim, Windsor Medical failed to prove the essential elements of fraud. Third, Spectrum maintains the evidence did not support a finding Spectrum acted with actual malice; therefore, the award of punitive damages was not warranted. We disagree.

*Fraud and the Economic Loss Doctrine*

**{¶25}** To prevail on a fraud claim, "a plaintiff must prove: (1) a representation, or if a duty to disclose exists, concealment of a fact, (2) that is material to the transaction at issue, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent to mislead another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance." *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. No. 11AP-603, 978 N.E.2d 974, 2012-Ohio-4371, ¶ 49, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986).

**{¶26}** The economic loss rule generally prevents recovery in tort of damages for purely economic loss. *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d

412, 2005-Ohio-5409, ¶ 6, 835 N.E.2d 701.  That is, "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Id.* (Citation omitted.)  "The economic-loss rule stems from the principle that, '[i]n the absence of privity of contract between two disputing parties the general rule is "there is no * * * duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things." ' " *Waverly City School Dist. Bd. of Edn. v. Triad Architects, Inc.*, 10th Dist. No. 08AP-329, 2008-Ohio-6917, ¶ 26, quoting *Floor Craft Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 3, 560 N.E.2d 206 (1990), quoting Prosser & Keeton, Law of Torts, Section 92, 657 (5th Ed.1984).

**{¶27}** There are exceptions, however, to the application of the economic loss rule to bar recovery in tort of purely economic loss.  A plaintiff may pursue such a tort claim if it is "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity."  *Corporex*, supra at ¶ 9. These types of exempt claims may include negligent misrepresentation, breach of fiduciary duty, fraud, and conversion. *Potts v. Safeco Ins. Co.*, 5th Dist. No. 2009 CA 0083, 2010-Ohio-2042, ¶ 21; *Morgan v. Mikhail*, 10th Dist. No. 08AP-87, 2008-Ohio-4598, ¶ 69.

**{¶28}**  Therefore, a tort claim can proceed where "the facts of the case show an intentional tort committed independently, but in connection with a breach of contract * * *." *Burns v. Prudential Securities, Inc.,* 167 Ohio App.3d 809, 2006–Ohio–3550, ¶ 99. Accordingly, where a tort claim alleges a duty was breached independent of the contract, the economic loss rule does not apply. See, *Campbell v. Krupp,* 195 Ohio App.3d 573,

961 N.E.2d 205, 2011–Ohio–2694, ¶ 16 (6th Dist.) See also, *Eysoldt v. ProScan Imaging,* 194 Ohio App.3d 630, 2011–Ohio–2359, ¶21 (1st Dist.) (finding the economic loss rule does not apply to intentional torts, as they are breaches of duties beyond those created by contract). Where the tort claim alleges a breach of an independent duty, it must also allege damages that are separate and distinct from the breach of contract. *Strategy Group for Media, Inc. v. Lowden,* 5th Dist. Delaware No. 12 CAE 03 0016, 2013–Ohio–1330, ¶ 30.

**{¶29}** Spectrum claims Windsor Medical failed to identify a duty separate from Spectrum's contractual obligations. We disagree. While the parties were in privity of contract, we find Spectrum breached duties which were independent of those contractual obligations. A review of the record, including a reading of the entire trial transcript, which is summarized below, reveals Spectrum, through its representatives, engaged in a pattern of misrepresentations, false promises, and threats.

**{¶30}** Despite assurances from Patrick Harrison Windsor Medical's telephones would not have international calling capabilities, Spectrum billed Windsor Medical for international calls in September, 2015. Swallen made exhaustive attempts to resolve the billing issue, but was repeatedly placed on hold or redirected to individuals who did not have authority to help him. Months later Spectrum acknowledged the error and indicated a credit would be forthcoming, however, Spectrum continued to send past due notices to Windsor Medical. Spectrum eventually issued a partial credit. Swallen's attempts to obtain the balance of the promised credit was met with the same runaround he previously experienced. Spectrum never fully credited Windsor Medical for the billing error and the amount remained "past due". In January, 2017, Spectrum again billed Windsor Medical

for international calls. Spectrum failed to resolve the billing issue and threatened to disconnect phone service if the disputed charge was not paid. Windsor Medical subsequently paid the un-owed past due charges to avoid disruptions to its phone service. Spectrum never credited Windsor Medical for these charges.

{¶31} In the fall of 2015, Harrison approached Swallen about replacing Windsor Medical's internet service, promising better internet speed at a lower rate. Swallen signed a new internet contract in December, 2015. Harrison represented he would have the old service disconnected when the new service was ready. Harrison never notified Swallen the new service was ready and never disconnected the old service. Nonetheless, Spectrum billed Windsor Medical for two separate internet accounts. When Swallen contacted Harrison about the double billing, Harrison informed Swallen he was not permitted to cancel the account and Swallen would need to do so. Swallen attempted to cancel the account, but the account number Harrison had provided to Swallen was incorrect. Spectrum continued to double bill Windsor Medical.

{¶32} Swallen met with account representative Armand DiDonato to discuss the situation. DiDonato promised to resolve the double billing. Although the new service required new equipment, and despite continuing to double bill Windsor Medical, Spectrum never installed the necessary equipment for the new service and never provided Windsor Medical with a new IP address.

{¶33} Inexplicably, almost a year later, DiDonato emailed Swallen, inquiring whether Windsor Medical had two internet connections. DiDonato represented he would contact a national account team to resolve the credit issue with the second internet account and complete any paperwork necessary to do so. Despite these ongoing

discussions to resolve the issues, Spectrum issued multiple threats of termination of phone service.  At one point in 2017, a third-party collection agency came to the facility and advised the accounts payable individual the telephone service would be shut off that day if payment was not received.  Windsor Medical paid Spectrum $2,165.96, to avoid any disruptions in its phone service.   Spectrum applied the payment to the disputed internet account and not the phone service account.

{¶34} Subsequently, on May 4, 2017, Spectrum shut off the phone system at Windsor Medical due to nonpayment of the admittedly disputed internet charges. DiDonato informed Swallen Windsor Medical's account was not in a non-pay status, however, fiber support advised Swallen the phone system was, in fact, disconnected for nonpayment of the internet account.  DiDonato acknowledged the erroneous double billing, but advised Swallen to pay the disputed internet charges as doing so was the fastest way to restore the phone service.  Windsor Medical paid the disputed charges. Months passed without resolution.   Then, in August, 2017, Spectrum's collection department emailed Swallen, demanding an additional $1,129.48, to avoid another phone shut off.

{¶35} The evidence presented establishes the fraud claim asserted by Windsor Medical did not arise out of the parties' contracts, but went beyond and were independent of those agreements. Windsor Medical's fraud claim went beyond Spectrum's failure to abide by the terms of the parties' contracts. Spectrum engaged in deceptive billing practices, charging Windsor Medical for international calls and a second internet service which did not exist.  Spectrum fraudulently represented it would resolve the billing issues,

but instead of doing so, Spectrum disconnected phone service forcing Windsor Medical to pay what amounts to a ransom.

**{¶36}** Spectrum further contends the damages Windsor Medical alleged under its fraud claim were entirely dependent upon the terms of the parties' contracts. We disagree. The damages Windsor Medical sought were the result of Spectrum's deceptive and fraudulent billing. The damages were amounts Windsor Medical paid to prevent disruption to its phone service which was vital to its operations. These payments included charges for international calls, which Spectrum conceded were erroneously billed and for which Windsor Medical was owed a credit, and for a second internet account, which Spectrum never actually installed. The amounts Windsor Medical paid Spectrum were not owed under the contracts.

**{¶37}** Because there was sufficient evidence to support the jury's verdict, we find the trial court did not err in denying Spectrum's motion for judgment notwithstanding the verdict on the fraud claim and the economic loss doctrine.

*Punitive Damages*

**{¶38}** In cases alleging fraud, in order to be awarded punitive damages, the plaintiff must establish not only the elements of the tort itself, but must also show either the fraud is aggravated by the existence of malice or ill, or must demonstrate the wrongdoing is particularly gross or egregious. *Atram v. Star Tool & Die Corp.* (1989), 64 Ohio App.3d 388, 391–392, 581 N.E.2d 1110; *Mid–America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 602, 579 N.E.2d 721. There must be an element of malice, oppressive conduct, or outrage to sustain such an award. *Id.*

{¶39} The "actual malice" necessary for purposes of an award of punitive damages has been defined as (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 316, 736 N.E.2d 517, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus; *Kemp v. Kemp*, 5th Dist. No. 04CA011, 161 Ohio App.3d 671, 2005-Ohio-3120, 831 N.E.2d 1038, ¶ 73.

{¶40} Whether actual malice exists is a question for the trier of fact. *Spires v. Oxford Mining Co., LLC*, 7th Dist. Belmont No. 17 BE 0002, 2018-Ohio-2769, 116 N.E.3d 717, ¶ 32, citing *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 720 N.E.2d 495; R.C. 2315.21(C)(1). "The same standard of review is employed to assess the weight of evidence whether the finding is for compensatory damages or the elements necessary to justify an award of punitive damages." *Id.*, citing *Bosak v. Kalmer*, 7th Dist. Mahoning No. 01 CA 18, 2002-Ohio-3463, ¶ 36. Factual determinations will not be overturned as long as they are supported by some competent, credible evidence going to all the essential elements of the case. *Id.*, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.

{¶41} The trial court properly instructed the jury on the standard for the imposition of punitive damages.   A jury is presumed to follow the instructions of the trial court. *MCM Home Builders, LLC v. Sheehan*, 5th Dist. Delaware No. 18 CAE 09 0074, 2019-Ohio-3899, 2019 WL 4724682, ¶ 48 citing *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. This Court will not invade the province of a

properly instructed jury which reached a reasonable decision based upon the evidence presented to it. *Estate of Baxter v. Grange Mut. Cas. Co.*, 73 Ohio App.3d 512, 521 (1992).

{¶42} Upon review and as detailed, supra, we conclude the jurors could have reasonably determined Spectrum acted with actual malice which warranted an award of punitive damages. The evidence supports the jury's determination Spectrum's conduct was, indeed, egregious. Accordingly, we find the trial court did not abuse its discretion in confirming the award via its ruling on the motion for judgment notwithstanding the verdict on the issue of punitive damages.

{¶43} Spectrum's sole assignment of error is overruled.

{¶44} The judgment of the Stark County Court of Common Pleas is affirmed.


By: Hoffman, P. J.
Delaney, J. and
Baldwin, J. concur