[Cite as *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 2021-Ohio-1425.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

NAVISTAR, INC.

      Defendant-Appellant

-vs-

DUTCHMAID LOGISTICS, INC.

      Plaintiff-Appellee

JUDGES:
Hon. Craig R. Baldwin, P.J.
Hon. William B. Hoffman, J.
Hon. Earle E. Wise, Jr., J.

Case No. 2020 CA 00003

O P I N IO N

CHARACTER OF PROCEEDINGS:      Appeal from the Licking County Court of
Common Pleas, Case No. 15CV0129

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      April 22, 2021

APPEARANCES:

For Defendant-Appellant

ROMAN MARTINEZ
SHANNON GRAMMEL
Latham & Watkins, LLP
555 Eleventh Street, NW, Suite #1000
Washington, DC 20004-1304

KEVIN M. JAKOPCHEK
Latham & Watkins, LLP
330 N. Wabash, Suite #2800
Chicago, IL 60622

For Plaintiff-Appellee

MARK KITRICK
SEAN HARRIS
Kitrick, Lewis & Harris Co., LPA
515 East Main Street, Suite #515
Columbus, OH 43215-5398

CLAY MILLER
LAWRENCE R. LASSITER
Miller Weisbrod, LLP
12750 Merit Drive, Suite #1100
Dallas, TX 75251

For Defendant-Appellant

JESSICA Z. BARGER
NATASHA N. TAYLOR
Wright Close & Barger, LLP
One Riverway, Suite #2200
Houston, TX 77056

For Defendant-Appellant

TIMOTHY C. AMMER
LINDSAY M. UPTON
Montgomery Jonson, LLP
600 Vine Street, Suite #2650
Cincinnati, OH 45202

*Hoffman, J.*

**{¶1}** Defendant-appellant Navistar, Inc. ("Navistar") appeals the July 29, 2019 Final Judgment entered by the Licking County Court of Common Pleas, memorializing the jury's verdict in favor of plaintiff-appellee Dutchmaid Logistics, Inc. ("Dutchmaid") on Dutchmaid's fraud claim and the jury's award of compensatory and punitive damages.

STATEMENT OF THE FACTS AND CASE

**{¶2}** Dutchmaid is a logistics company and the owner and operator of a commercial trucking fleet which is engaged in the business of hauling dry and refrigerated commodities across 48 states. Navistar manufacturers heavy-duty commercial trucks and diesel engines. Prior to 2008, Dutchmaid primarily operated CAT and Cummins-powered trucks. Between 2008, and 2009, Dutchmaid purchased nine Navistar trucks equipped with Navistar's first generation MaxxForce engines ("MaxxForce 1 trucks") and six Navistar trucks equipped with Cummins engines.

**{¶3}** The MaxxForce 1 trucks began experiencing significant mechanical issues after being driven approximately 100,000 miles. After the MaxxForce 1 trucks reached the 125,000 mile mark, the mechanical issues increased substantially, most often due to the failure of the Exhaust Gas Recirculation ("EGR") cooler. The EGR cooler is part of the EGR system which pumps engine exhaust back into the engine in order to lower emissions. All of Dutchmaid's MaxxForce 1 trucks lost their EGR coolers. Due to the ongoing issues, Dutchmaid moved the MaxxForce 1 trucks to its local fleet which hauled shorter distances. Dutchmaid also contemplated retiring the MaxxForce 1 trucks earlier than the company normally retires the trucks in its fleet.

**{¶4}** In late 2010, Dutchmaid began the process of purchasing additional trucks for its fleet. Navistar's sales representative, John Lasson, and his team met with Sam

Burrer, Dutchmaid's General Manager, to discuss the purchase of Navistar's second generation MaxxForce trucks ("MaxxForce 2 trucks"), which were designed to meet the EPA's 2010 lower emissions standards. Burrer informed Lasson Navistar would have to convince Dutchmaid the issues it had experienced with the MaxxForce 1 trucks were resolved and corrected before Dutchmaid would consider purchasing MaxxForce powered trucks again.

{¶5} After extensive discussions, visits to Navistar's manufacturing plant, and repeated assurances of the reliability of and the testing conducted on the MaxxForce 2 trucks, Dutchmaid purchased twenty MaxxForce 2 trucks between 2011, and 2012. Over the three years during which Dutchmaid owned and operated the MaxxForce 2 trucks, the vehicles were in the shop for warranted repairs on more than 100 separate occasions. The problems necessitating the repairs included EGR system failures.

{¶6} On February 11, 2015, Dutchmaid filed a complaint against Navistar, asserting, inter alia, claims of breach of express warranty and fraud by nondisclosure.

{¶7} At trial, Burrer testified regarding Dutchmaid's ongoing issues with the MaxxForce 1 trucks, the need to purchase new trucks, and how and why Dutchmaid ultimately decided to purchase the MaxxForce 2 trucks. Burrer explained, in 2010, the EPA established new standards for emissions and Dutchmaid had to purchase new trucks for its fleet. In January, 2011, Dutchmaid began to run three test trucks: a Freightliner truck with a Cummins engine, a Freightliner truck with a Detroit Diesel engine, and a MaxxForce 2 truck. Dutchmaid wanted to be assured Navistar had conducted sufficient field testing on the MaxxForce 2 trucks. Burrer noted, "[W]e want to see lots of trucks

with lots of miles and in real-world environments."  Trial Transcript, Vol. III at p. 747.  Burrer added running one test truck would not tell him enough about reliability.

{¶8}    The Freightliner trucks were equipped with the newly developed Selective Catalytic Reduction ("SCR") system to meet the EPA's lower emission standards.  Navistar continued to rely solely on the EGR system.   During discussions with Freightliner, Burrer learned the EGR-only emissions system used in the MaxxForce 2 trucks pumped even more hot exhaust gases through the engines, resulting in excessive heat which could lead to EGR cooler cracking.  Burrer expressed his concerns about this potential problem to Lasson, asking, "[W]hat are you guys doing to convince me that you've got this problem resolved, that it's going to be good from here forward?" Tr. at 749-750.

{¶9}    Although the MaxxForce 2 test truck satisfied Dutchmaid's questions about fuel economy, the overall reliability of the MaxxForce 2 trucks remained a major concern for Dutchmaid.   Between January and June, 2011, Lasson and his team visited Dutchmaid and Burer at least a half-dozen times and, each time, Burer raised concerns about reliability of the MaxxForce 2 trucks.  Burrer "always talked to them about testing," explaining: "To me, that's the most important thing you can to do.  And – and I mean field testing.  For me, I think that's most critical.   Some guys may disagree with it, but I think field testing is absolutely critical in that they run a lot of miles and they have two to three years, at least, of testing."  Tr. at 754.  Navistar repeatedly told Dutchmaid and Burrer it had field tested multiple trucks over the course of two to three years and some of the trucks had achieved 200-300 thousand test miles.

**{¶10}** At every meeting, Burrer also asked Navistar if the issues with the EGR coolers had been resolved. Each time, Navistar informed Burrer the EGR system had been reengineered, redesigned, and, as a result, the EGR cooler was more robust. Navistar indicated the EGR cooler would last the life of the truck's engine and the engine would be reliable for over a million miles. Anthony Greszler, Dutchmaid's expert witness, testified the standard engine life for trucks of this kind is 1.2 million miles.

**{¶11}** Burrer traveled to Navistar's Alabama manufacturing plant. Navistar engineers gave Burrer a tour of the plant, showed him a disassembled engine, and engaged in discussions with him regarding the testing conducted on and improvements made to the MaxxForce 2 engines. Navistar's repeated assurance the EGR system issues had been resolved was the main factor which convinced Dutchmaid to purchase the MaxxForce 2 trucks. Tr. Vol. IV at 1089. According to Burrer, Dutchmaid would not have purchased the trucks if Navistar had disclosed the information it had. *Id.* at 1092-1093.

**{¶12}** Burrer described the problems Dutchmaid had with the new MaxxForce 2 trucks. The MaxxForce 2 trucks were down for repairs 1,288 days during the time Dutchmaid operated the vehicles. This downtime resulted in lost profits of $298,271. In 2013, the MaxxForce 2 trucks achieved, on average, 13,000 less miles per truck than Dutchmaid's non-MaxxForce engine powered trucks. In 2014, the MaxxForce 2 trucks achieved, on average, 19,000 less miles per truck. After only 3 ½ years, Dutchmaid traded the MaxxForce 2 trucks out early because of the disruption to the company's operations. Based upon industry resale data, Dutchmaid's early and unexpected disposal of the Maxxforce 2 trucks resulted in a loss of $35,825/truck.

{¶13} Gerald Billinghurst, a sales representative for Truck Sales & Service[1], arranged Burrer's visit to the Navistar factory and traveled to Alabama with him. Billinghurst was well aware of the problems Dutchmaid was having with the MaxxForce 1 trucks. Billinghurst explained the biggest issue Dutchmaid had with the MaxxForce 1 trucks was reliability and the purpose of the trip to Alabama was for Burrer to gain confidence in the MaxxForce 2 engines. Over the course of the business relationship between Dutchmaid and Truck Sales & Services, Burrer and at least two other Dutchmaid employees expressed to Billinghurst their displeasure with the performance of the MaxxForce 1 trucks and the ongoing issues with the EGR coolers. Billinghurst was also aware Dutchmaid had concerns about buying new trucks equipped with MaxxForce 2 engines. He was present at a number of meetings with Burrer and different Navistar representatives. During the visit to Navistar's Alabama factory, Billinghurst heard Navistar representatives tell Burrer the issues Dutchmaid experienced with the EGR cooler and EGR system had been resolved.

{¶14} Billinghurst testified regarding his personal experience with the breakdowns of the MaxxForce 1 trucks. He described the downtime as "Not good. And to the point of terrible in some instances because they were down for two weeks to a month, in some instances." Tr. Vol. IV at 1128. Billinghurst recalled the trucks spent "a lot of time" in their shop. Truck Sales & Service "worked guys overtime to keep this fleet going because of the issues that were out there that we knew about." *Id.* Billinghurst added, "There was a part shortage because of the demand for...certain parts that were breaking." *Id.* Truck Sales & Service also experienced issues getting the trucks into the shop. Billinghurst

---

[1] Dutchmaid purchased the trucks in its fleet, including the Maxx Force 1 and MaxxForce 2 trucks, from Truck Sales & Service.

explained, "There were other customers' trucks, other MaxxForces in the parking lot that needed repairs also. And we ran into that with…dealerships across the state." *Id.* at 1129. It was not uncommon for Dutchmaid to have multiple trucks down at the same time.

{¶15} While conversations were ongoing between Dutchmaid and Navistar relative to Dutchmaid purchasing MaxxForce 2 trucks, Navistar, at its highest corporate levels, was aware of the issues with the MaxxForce 2 engines. Jim Hebe, Navistar's Vice President of North American Sales and former CEO of Freightliner, indicated Navistar "did a very bad job testing this truck [MaxxForce 2] before launch." Playback of Video Deposition of James Hebe Tr. at 2631. Hebe described the testing of the MaxxForce 2 engines as "not typical," less than the usual three-year cycle. Hebe disputed the testimony of Navistar representatives who stated Navistar had more than 4.5 million miles of field testing on the final engine before the trucks went to market. *Id.* at 2634. In the final testing, issues remained with the EGR cooler, the EGR valve, and the bellows valve in the EGR system. *Id.* at 2637. In June or July, 2010, Navistar engineers advised Hebe the trucks were not ready to launch. *Id.* at 2638. Hebe opined Navistar "didn't test the final product in its final form in a manner that would have been consistent with normal industry practice." *Id.* at 2643.

{¶16} Dennis Mooney, who was the Senior Vice President of Product Development at the time of trial, testified he was involved in all aspects of engine engineering, including the testing and validation of the engines. Playback of Video Deposition of Dennis Mooney Tr. at 2656. In a December, 2012 email to Navistar CEO Troy Clarke, Mooney expressed "[s]ome thoughts on our current quality." *Id.* at 2691. His intention was to provide Clarke with his "opinion of the background of what got us to

where we were," i.e., all the warranty expense Navistar was incurring on the MaxxForce 2 trucks. *Id.* at 2694. In the email, Mooney noted, "[t]he entire auto and heavy-duty truck industry standard is 48 months for a new – new engine/emission system development. * * * When I got here in January of 2010, we were still finalizing DV design[2] six months before start of production. We had no time to validate and get miles on trucks." *Id.* at 2692. Mooney acknowledged the "field test trucks were essentially engineering development trucks," not validation trucks. *Id.* Navistar was changing hardware "weekly as we were finding and trying to fix problems, many of which were infant mortality problems."[3] *Id.*

{¶17} During his trial testimony, Mooney explained he "learned a couple of things since [he] wrote the e-mail" and he discovered the engine had been in production three years prior to 2010. *Id.* at 2735-2736. Mooney stated the testing conducted on the MaxxForce 2 trucks was not compressed into a six-month period. *Id.* at 2741. Mooney added the majority of the testing on the engine and its components had been going on for several years. *Id.* at 2741-2742.

{¶18} Shane Spencer, Navistar's corporate representative, acknowledged when the MaxxForce 2 trucks were launched in 2010, the EGR cooler had a life of 225,000 miles. Spencer explained this information would not have been disclosed to Dutchmaid or other potential buyers unless specifically asked because it is not industry practice to talk about the life of a particular component in an engine. Tr. Vol. III at 498. Navistar launched the MaxxForce 2 based upon the overall reliability of the engine. *Id.* at 493.

---

[2] "DV" stands for design validation or verification.

[3] Infant mortality refers to low mileage trucks.

When questioned about why Navistar never disclosed the issue with the EGR cooler, Spencer repeatedly explained Navistar had completed its test plan and "we were meeting our reliability goals at the engine level." *Id.* at 509. Navistar made over a dozen design changes or quality improvements to the EGR cooler between the launch and Dutchmaid placing its first order of MaxxForce 2 trucks in July, 2011. *Id.* at 535- 536. Spencer explained changes and improvements are continuously rolled out over time with any component. *Id.* at 536.

**{¶19}** In an earnings call with investors after the first quarter of 2012, Jack Allen, Navistar's COO, indicated "an unusually high frequency of repair on a couple of significant components," to wit: the EGR cooler and the EGR valves, were the biggest warranty cost drivers. *Id.* at 685; Playback of Jack Allen Video Deposition Tr. at 2809. In a March 5, 2012 email, Mark Reiter, Navistar's Vice President of Product Support, recognized the EGR coolers, EGR valves, and EGR bellows were "significant contributing factors" to the $112 million in warranty costs, but cautioned Navistar needed "to be very careful of the analyst day messaging." Tr. at 1918-1920. Reiter was unaware of any disclosures made to Dutchmaid admitting Navistar's warranty issues were related to EGR coolers and EGR valves. At trial, Reiter conceded the EGR coolers and EGR valves were the two biggest drivers of Navistar's warranty costs. Tr. at 1927.

**{¶20}** After hearing all the evidence and deliberating, the jury found in favor of Dutchmaid on its fraudulent nondisclosure claim, and in favor of Navistar on Dutchmaid's breach of warranty claim. The jury awarded Dutchmaid compensatory damages in the amount of $75,000, for lost profits and $200,000, for diminished value. The jury also

awarded punitive damages in the amount of $1,025,000, finding Navistar committed aggravated or egregious fraud.  The trial court journalized the verdict on July 29, 2019.

**{¶21}** It is from this judgment Navistar appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED BY FAILING TO GRANT JUDGMENT TO NAVISTAR ON DUTCHMAID'S FRAUDULENT NONDISCLOSURE CLAIM BECAUSE DUTCHMAID "FAILED TO ESTABLISH DAMAGES [FOR THE ALLEGED FRAUD] SEPARATE FROM THOSE IT ARGUED WERE ATTRIBUTABLE" TO NAVISTAR'S ALLEGED BREACH OF WARRANTY.  *TEXTRON FIN. CORP. V. NATIONWIDE MUT. INS. CO.,* 115 OHIO APP. 3D 137, 153 (9TH DIST. 1996).

II. THE TRIAL COURT ERRED BY FAILING TO GRANT JUDGMENT TO NAVISTAR ON DUTCHMAID'S FRAUDULENT NONDISCLOSURE CLAIM BECAUSE THAT CLAIM IS BARRED BY THE EXPRESS DISCLAIMERS THE PARTIES AGREED TO IN THE LIMITED WARRANTY.  *SEE GALMISH V. CICCHINI*, 90 OHIO ST. 3D 22, 27-29 (2000); *GOODYEAR TIRE & RUBBER CO. V. CHILES POWER SUPPLY, INC.*, 7 F. SUPP. 2D 954, 962-63 (N.D. OHIO 1998).

III. THE TRIAL COURT ERRED BY MISINSTRUCTING THE JURY ON THE BURDEN OF PROOF FOR DUTCHMAID'S FRAUDULENT NONDISCLOSURE CLAIM, *SEE CRAWFORD V. STAN*, 2012-OHIO-3624, PARAS. 20, 23 (5TH DIST.); *RAPPORT V. KOCHOVSKI*, 185 OHIO

APP. 3D 309, 313-15 (5TH DIST. 2009), AND BY FAILING TO INSTRUCT THE JURY AS TO THE LEGAL SIGNIFICANCE OF THE PARTIES' EXPRESS DISCLAIMERS.

IV. THE TRIAL COURT ERRED BY FAILING TO GRANT NAVISTAR A NEW TRIAL ON DUTCHMAID'S PUNITIVE DAMAGES BECAUSE THE JURY'S FINDING ON PUNITIVE DAMAGES CANNOT BE SUSTAINED. *SEE LOGSDON V. GRAHAM FORD CO.,* 54 OHIO ST. 2D 336, 339-40 (1978).

I

**{¶22}** In its first assignment of error, Navistar maintains the trial court erred in failing to grant judgment in favor of Navistar on Dutchmaid's fraudulent nondisclosure claim. Specifically, Navistar argues, because Dutchmaid sought "the exact same damages for Navistar's alleged fraud as it also sought for Navistar's alleged breach of warranty," the fraudulent nondisclosure claim fails as a matter of law. Brief of Appellant at 11.

**{¶23}** Navistar relies upon *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App.3d 137, 684 N.E.2d 1261 (1996), in support of its position. Therein, the Ninth District Court of Appeals stated:

In Ohio, a breach of contract does not create a tort claim. (Citation omitted). Generally, "the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim." *Id.* (Citation omitted).

A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. (Citation omitted).  * * * In addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract. (Citations omitted).  *Id.* at 151.

**{¶24}** Navistar focuses on the second requirement, i.e., "actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract."  Navistar explains the additional damages rule "distinguishes between contract and fraud claims by focusing on the nature of the claimed injury."  Brief of Appellant at 13. Navistar submits, because "Dutchmaid asserted the exact same damages under its warranty and fraud theories – lost profits and diminished value – and submitted the exact same damages to the jury for each theory of liability: $1,248,851.00," Dutchmaid "thus 'failed to establish damages separate from those it argued were attributable' to Navistar's alleged breach of warranty, and its fraud claim fails."  *Id.*

**{¶25}**  Navistar cites a number of federal cases interpreting applicable state law in support of its position the additional damages requirement "invalidates" Dutchmaid's fraud claim. *Id.*  These cases address the economic loss doctrine.  In Ohio, "[t]he economic-

loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. "This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs'." *Id.*, quoting *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 42, 537 N.E.2d 624 (1989).

**{¶26}** This Court recently addressed the application of the economic loss rule to a fraud claim in *Windsor Medical Center, Inc. v. Time Warner Cable, Inc.*, 5th Dist. Stark No. 2020CA00085, 2021-Ohio-158. In that case, Windsor Medical, a skilled nursing and senior living center, brought an action against Time Warner Cable, nka Spectrum, which provided the facility's telephone, internet, and cable service. *Id.* at ¶2. Windsor Medical sought damages for fraud and violations of Ohio's Deceptive Trade Practices Act. *Id.* at ¶4. The jury found in favor of Windsor Medical on the fraud claim, and awarded compensatory and punitive damages. *Id.* at ¶19. The jury found in favor of Spectrum on Windsor Medical's claim for deceptive trade practices. *Id.* Spectrum filed a motion for judgment notwithstanding the verdict, which the trial court denied. *Id.* at ¶20.

**{¶27}** On appeal, Spectrum argued the economic loss rule barred Windsor Medical's fraud claim as such claim sounded in contract. *Id.* at ¶24. We disagreed, finding:

> There are exceptions, however, to the application of the economic
>
> loss rule to bar recovery in tort of purely economic loss. A plaintiff may

pursue such a tort claim if it is "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity." *Corporex*, supra at ¶ 9. These types of exempt claims may include negligent misrepresentation, breach of fiduciary duty, fraud, and conversion. *Potts v. Safeco Ins. Co.*, 5th Dist. No. 2009 CA 0083, 2010-Ohio-2042, 2010 WL 1839738, ¶ 21; *Morgan v. Mikhail*, 10th Dist. No. 08AP-87, 2008-Ohio-4598, 2008 WL 4174063, ¶ 69.

Therefore, a tort claim can proceed where "the facts of the case show an intentional tort committed independently, but in connection with a breach of contract * * *." *Burns v. Prudential Securities, Inc.,* 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621, ¶ 99. Accordingly, where a tort claim alleges a duty was breached independent of the contract, the economic loss rule does not apply. See, *Campbell v. Krupp,* 195 Ohio App.3d 573, 2011-Ohio-2694, 961 N.E.2d 205, ¶ 16 (6th Dist.) See also, *Eysoldt v. ProScan Imaging,* 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶21 (1st Dist.) (finding the economic loss rule does not apply to intentional torts, as they are breaches of duties beyond those created by contract). Where the tort claim alleges a breach of an independent duty, it must also allege damages that are separate and distinct from the breach of contract. *Strategy Group for Media, Inc. v. Lowden,* 5th Dist. Delaware No. 12 CAE 03 0016, 2013-Ohio-1330, 2013 WL 1343614, ¶ 30. *Id.* at ¶ 27-28

{¶28} In accordance with our decision in *Windsor* Medical, we find the economic loss rule does not apply to bar Dutchmaid's fraud claim. Navistar breached duties which were independent of those which arose through the warranty. Navistar, through its representatives, purposely failed to disclose material information about the EGR cooler system on the MaxxForce 2 trucks despite Dutchmaid's inquiries. These nondisclosures occurred prior to Dutchmaid's purchase of any MaxxForce 2 trucks.

{¶29} We also reject Navistar's assertion Dutchmaid's fraud claim must fail because Dutchmaid did not establish damages separate from those it argued were attributable to Navistar's alleged breach of warranty. The United States Court of Appeals for the Sixth Circuit addressed this identical argument in *Regal Cinemas, Inc. v. W & M Props.,* 90 Fed. App'x 824 (6th Cir. 2004). The facts relevant to the matter before us are as follows: Regal Cinemas brought an action for fraud and breach of contract against W & M Properties, a developer, arising out of a real estate transaction under which W & M Properties was to build a theater at a shopping center developed and owned by W & M Properties in Macedonia, Ohio. *Id*. at *827. At the conclusion of the trial, the jury found for Regal Cinemas on its fraud claim, and in favor of W & M Properties on Regal Cinema's breach of contract claim. *Id*. On appeal, W & M Properties argued it was entitled to judgment as a matter of law because Regal Cinemas failed to establish two elements of fraud under Ohio law: justifiable reliance and resulting damages. *Id*. at *826.

{¶30} W & M Properties argued, inter alia, Regal Cinemas "was required to present evidence of damages separate from the damages that it claimed to have suffered due to the breach of the lease claim that the jury rejected." *Id*. at *831. The Sixth Circuit found, because the jury did not find a breach of contract, "there is no concern that the

fraud damages duplicate the damages resulting from a breach." *Id.* W & M Properties also sought to apply the proposition set forth in *Textron*, supra, "[a] party cannot recover under theories of both fraud and negligence based upon the same course of conduct." *Id.* at *832. The Sixth Circuit refused to do so, explaining:

Regal has not asked us to turn a mere breach of contract into a tort claim: rather, the fraud claim relates to distinct acts, especially since the jury found that there was no breach of contract in this case. Defendants' argument that, every time a party claims both breach of contract and fraud, the party cannot recover fraud damages that duplicate the damages that it claimed under breach of contract even where it has been determined there was no breach of contract, is flatly unreasonable. Not only does Ohio law not support this proposition, but reading it that way would result in a penalty for arguing in the alternative. *Id.*

{¶31} We agree with the rationale set forth in *Regal Cinemas*. In the instant action, the jury found Navistar did not breach the warranty. Because the jury so found, we find the damages the jury awarded for fraud were not duplicative of the damages sought by Dutchmaid on its breach of warranty claim. We further find the fraud and breach of warranty claims were not based upon the same course of conduct. The fraud claim was based upon distinct acts - Navistar's failure to disclose material information to Dutchmaid, effecting Dutchmaid's decision to purchase the MaxxForce 2 trucks. Navistar knew the issues with the EGR cooler system was the primary reason for Dutchmaid's

hesitancy in purchasing the trucks.  The breach of warranty claim was based upon the limited warranty provided to Dutchmaid subsequent to the purchases.

**{¶32}**  Based upon the foregoing, we find the trial court did not err in failing to grant judgment to Navistar on Dutchmaid's fraud claim.

**{¶33}**  Navistar's first assignment of error is overruled.

II

**{¶34}**  In its second assignment of error, Navistar contends the trial court erred in failing to grant judgment in favor of Navistar on Dutchmaid's fraudulent nondisclosure claim as said claim fails in light of the parties' express disclaimer.  We disagree.

**{¶35}**  The disclaimer incorporated into Navistar's limited warranty provides, in pertinent part:

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN.  THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED.  THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company, and no other person is authorized to give any warranties

or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

{¶36} Navistar submits Ohio law does not permit a fraud claim to override an express disclaimer in a contractual agreement based upon two interrelated principles: (1) a party to a contract may not claim fraud based upon an alleged "promise, the terms of which are directly contradicted by" the contract. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 29, 734 N.E.2d 782 (2000); and (2) "[n]o party to a contract can claim [justifiable] reliance upon any representation which is expressly disclaimed by another party." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 962-963 (N.D. Ohio 1998).[4] We shall address each principle in turn.

{¶37} The parol evidence rule states "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish*, supra at 27, citing 11 Williston on Contracts (4 Ed.1999) 569–570, Section 33:4.

{¶38} The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Id.*, citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074, 1080. "By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments." *Id.* "It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent

---

[4] The word "justifiable" was inserted by Navistar and replaced the word "such".

written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." *Id.* at 27-28, citing 11 Williston on Contracts, *supra,* at 541–548, Section 33:1 (Footnotes omitted in original).

**{¶39}** However, "a party may produce evidence of a contemporaneous oral agreement when that agreement was made in order to induce the party into entering the written contract." *Stormont v. Tenn–River Trading Co., Inc.,* 10th Dist. Franklin No. 94APG08–1272, *3 (Apr. 27, 1995), citing *Walters v. First National Bank of Newark* (1982), 69 Ohio St.2d 677, 681. There is a distinct difference between prohibiting prior or contemporaneous agreements to vary the terms of a written contract versus prohibiting prior or contemporaneous statements to induce a party into entering into the contract.

**{¶40}** Burrer testified Dutchmaid would not have purchased MaxxForce 2 trucks had it known Navistar had not conducted adequate field testing, the EGR system issues were still unresolved, and the EGR cooler would not last the life of the truck's engine. Because Navistar's representations to the contrary and nondisclosures induced Dutchmaid to purchase the MaxxForce 2 trucks, we find the evidence as to these nondisclosures is not prohibited by the parol evidence rule.

**{¶41}** In addition to its contention Ohio law does not permit a fraud claim to override an express disclaimer under the parol evidence rule, Navistar also argues a party to a contract cannot claim reliance upon any representation which is expressly disclaimed. Navistar cites two cases from the United States District Court for the Northern District of Ohio, *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, supra, and *Keller Logistics, Inc. v. Navistar, Inc.*, 2020 WL 4597283, in support.

**{¶42}** We find *Goodyear* to be factually distinguishable.  Therein, Chiles Power Supply dba Heatway Systems ("Heatway"), a manufacturer of hydronic radiant heating systems, entered into negotiations with Goodyear for the supply of Entran II rubber hoses. *Id.* at 956.  After approximately one year of negotiations, the parties reached an agreement, which included a set of ten performance specifications for any Entran II supplied by Goodyear as well as the warranty which would apply to thereto.  *Id.* at 957. The warranty included not only a limited disclaimer of liability, but also a full disclaimer of reliance in its standard terms and conditions.  *Id.* at 963.  The warranty disclaimed most liability, expressly stating "[o]ther than those specifically set forth herein, there are no warranties which extend beyond the description of the products on the face hereof, either express or implied."  *Id.*

**{¶43}** Goodyear filed a complaint against Heatway, seeking, inter alia, a declaration its express disclaimers limited the extent to which it could be held accountable for any problem arising from the Entran II hose.  *Id.* at 961.   The U.S. District Court granted summary judgment in favor of Goodyear, finding the terms of the disclaimers gave Heatway fair warning as to the reliability of any representation external to the terms. *Id.* at 963.   The *Goodyear* Court concluded a reasonable jury could not find Heatway acted reasonably in relying upon any such representation.  *Id.*

**{¶44}** Unlike the parties in *Goodyear*, the parties herein did not negotiate the terms of the warranty.  The boilerplate language of the disclaimer incorporated into the limited warranty was drafted exclusively by Navistar. Dutchmaid did not have any bargaining power in this regard.  Further, we find the terms of the disclaimer did not give Dutchmaid "fair warning" as to the reliability of Navistar's nondisclosures.   The fraud

alleged by Dutchmaid was based upon Navistar's fraudulent concealment of material information. We hold a party cannot disclaim its fraudulent concealment of material information by incorporating boilerplate warranty language.

{¶45} Reviewing *Keller Logistics*, supra, we find a similar fact pattern to the instant action. Keller purchased thirty Navistar manufactured trucks from Defiance Truck Sales & Service in April 2011. *Id.* at *1. In July 2012, Keller leased another thirty-five Navistar manufactured trucks from GE CF Trust. *Id.* Navistar issued limited warranties, which state Navistar will "repair and replace" any covered components if necessary due to defective materials or workmanship. *Id.* "Not long after delivery, the trucks' EGR systems and related components began malfunctioning, resulting in repeated repairs." *Id.* Keller subsequently filed a complaint against Navistar in the United States District Court for the Northern District of Ohio, alleging, inter alia, fraud. *Id.* The fraud claims were based upon "'numerous misrepresentations [Navistar made] about the [t]rucks' in the months leading up to the two transactions." *Id.* at *2.

{¶46} In granting summary judgment in favor of Navistar, the *Keller* Court found Keller could not demonstrate Navistar owed a duty independent of the contract and Keller did not suffer any damages attributable only to the tortious conduct. *Id.* The *Keller* Court, relying on *Goodyear*, supra, also found the warranty language of the disclaimer precluded the fraud claims. *Id.*

{¶47} Although we recognize the warranty language is identical in *Keller* and the matter sub judice, we, nonetheless, find *Keller* to be distinguishable. The fraud claims asserted by Keller were based upon Navistar's misrepresentations. In the instant action, Dutchmaid's fraud claim was based, in large part, upon Navistar's concealment of

material information, information Navistar knew was critical to Dutchmaid's ultimate decision to purchase the MaxxForce 2 trucks. We find the warranty language of the disclaimer did not preclude Dutchmaid's fraud by nondisclosure claim. We further note there was no specific reference to the engine or EGR system in the warranty disclaimer.

{¶48} In a footnote, Navistar lists several Ohio cases: *Benko v. Smyk*, 11th Dist. Lake No. 2013–L–133, 2015-Ohio-1062; *Snider-Cannata Interests, LLC v. Ruper*, 8th Dist. Cuyahoga No. 93401, 2010-Ohio-1927; and *Abbott v. Loss Realty Group,* 6th Dist. Lucas No. L–05–1107, 2005-Ohio-5876, to further support its assertion there can be no justifiable reliance because of a disclaimer. These cases involved real estate transactions and do not provide guidance in the matter before this Court.

{¶49} We now address Navistar argument the contractual disclaimer conclusively bars Dutchmaid's fraudulent nondisclosure claim. Navistar contends because the "allegedly misleading partial disclosures here were not reflected in the Limited Warranty or in any other written agreement between the parties" and were "inherently inconsistent with the disclaimer," Dutchmaid's reliance on such statements was not justifiable. Brief of Appellant at 23-24.

{¶50} "[T]he presence of a disclaimer does not necessarily shield a defendant from liability or mean that a plaintiff will not be able to demonstrate justifiable reliance." *Northpoint Properties v. Charter One Bank,* 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, 2011 WL 2112666, ¶ 63. "Courts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements." *In re Natl. Century Fin. Ent., Inc., Invest. Litigation*, 541 F.Supp.2d 986, 1005 (S.D.Ohio 2007).

**{¶51}** Dutchmaid asked questions and Navistar knowingly provided false answers. We find a party cannot escape liability for his own deliberate misrepresentations and/or omissions by inserting boilerplate disclaimers into a limited warranty. See, *Milman v. Box Hill Systems Corp.,* 72 F.Supp.2d 220, 231 (S.D.N.Y.1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.").

**{¶52}** Alternatively, Navistar claims, even if Dutchmaid's fraud claim is not barred as a matter of law, the claim still fails as Dutchmaid did not present sufficient evidence of justifiable reliance. As set forth in our Statement of the Facts and Case, supra we find there was ample evidence from which the jury could find Dutchmaid's reliance on Navistar's statements was justified.

**{¶53}** Navistar's second assignment of error is overruled.

III

**{¶54}** In its third assignment of error, Navistar asserts the trial court erred in failing to properly instruct the jury   First, Navistar submits the trial court failed to instruct the jury on the correct burden of proof for a fraudulent nondisclosure claim. Next, Navistar claims the trial court erred in rejecting its proposed instructions regarding the legal import of the parties' express disclaimers.

**{¶55}** The determination of whether to give a jury instruction is a matter left to the sound discretion of the trial court. A trial court is obligated to provide jury instructions which correctly and completely state the law. *Cromer v. Children's Hospital Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921. The jury instructions also must be warranted by the evidence presented in the case. *Estate of Hall v. Akron Gen.*

*Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112. The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review. *Id.* An inadequate instruction which misleads the jury constitutes reversible error. *Marshall v. Gibson*, 19 Ohio St.3d 10, 482 N.E.2d 583 (1985). Our standard of review when it is claimed improper jury instructions were given is to consider the jury charge as a whole and determine whether the charge misled the jury in a manner affecting the complaining party's substantial rights. *Lowder v. Domingo*, 5th Dist. Stark No. 2016CA00043, 2017-Ohio-1241, 2017 WL 1231724.

**{¶56}** The trial court instructed the jury, "Dutchmaid must prove by the greater weight of the evidence each of the . . . elements" of fraud by nondisclosure. Navistar objected, arguing Dutchmaid had to prove its fraud claims by clear and convincing evidence.

**{¶57}** In support of its position, Navistar cites numerous cases from this District in which we found fraud must be established by clear and convincing evidence. Upon review, we find, in the majority of those cases, the plaintiff was seeking an equitable remedy. "A party seeking an equitable remedy, such as declaratory judgment, reformation or rescission of a contract, must prove a fraud claim with clear and convincing evidence, while a party seeking a monetary remedy must prove fraud by the preponderance of the evidence." *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. No. 11AP-603, 2012-Ohio-4371, 978 N.E.2d 974, ¶ 47, citing *Household Finance Corp. v. Altenberg,* 5 Ohio St.2d 190, syllabus, 214 N.E.2d 667 (1966).

**{¶58}** In the instant action, Dutchmaid did not seek equitable reformation or rescission of a contract, but rather compensatory and punitive damages resulting from

Navistar's fraudulent nondisclosures. Preponderance of the evidence thus was the required standard of proof, and the trial court did not err in so instructing the jury.

**{¶59}** Assuming, arguendo, the trial court erroneously instructed the jury on the burden of proof, we find such error to be harmless. The trial court properly instructed the jury, in order to award punitive damages, they must find Dutchmaid proved, by clear and convincing evidence, Navistar acted with malice, aggravated or egregious fraud, oppression, or insult. The jury awarded punitive damages; therefore, the jury necessarily found, by clear and convincing evidence, Navistar acted with malice, aggravated or egregious fraud, oppression, or insult. Because the trial court correctly instructed the jury with respect to punitive damages and the jury found clear and convincing evidence to award punitive damages, we find any error in the trial court's erroneous jury instruction as to the burden of proof for fraud did not affect the substantial rights of Navistar and was harmless.

**{¶60}** Within this assignment of error, Navistar also argues the trial court erred in failing to instruct the jury regarding the legal import of the parties' express disclaimer. For the reasons set forth in our analysis of Navistar's second assignment of error, supra, we find no error in the trial court's decision not to give the requested instructions.

**{¶61}** Navistar's third assignment of error is overruled.

IV.

**{¶62}** In its final assignment of error, Navistar challenges the jury's award of punitive damages, asserting there was no evidence of actual malice or that the fraud was "intentionally committed with the purpose of causing injury" to Dutchmaid.

{¶63} In cases alleging fraud, in order to be awarded punitive damages, the plaintiff must establish not only the elements of the tort itself, but must also show either the fraud is aggravated by the existence of malice or ill, or must demonstrate the wrongdoing is particularly gross or egregious. *Atram v. Star Tool & Die Corp.* (1989), 64 Ohio App.3d 388, 391–392, 581 N.E.2d 1110; *Mid–America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 602, 579 N.E.2d 721. There must be an element of malice, oppressive conduct, or outrage to sustain such an award. *Id.*

{¶64} The "actual malice" necessary for purposes of an award of punitive damages has been defined as (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 316, 736 N.E.2d 517, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus; *Kemp v. Kemp*, 5th Dist. No. 04CA011, 161 Ohio App.3d 671, 2005-Ohio-3120, 831 N.E.2d 1038, ¶ 73.

{¶65} Whether actual malice exists is a question for the trier of fact. *Spires v. Oxford Mining Co., LLC,* 7th Dist. Belmont App. No. 17 BE 0002, 2018-Ohio-2769, 116 N.E.3d 717, ¶ 32, citing *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 720 N.E.2d 495; R.C. 2315.21(C)(1). "The same standard of review is employed to assess the weight of evidence whether the finding is for compensatory damages or the elements necessary to justify an award of punitive damages." *Id.*, citing *Bosak v. Kalmer*, 7th Dist. Mahoning App. No. 01 CA 18, 2002-Ohio-3463, 2002 WL 1483884, ¶ 36. Factual determinations will not be overturned as long as they are

supported by some competent, credible evidence going to all the essential elements of the case. *Id.*, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.

**{¶66}** Navistar explains the dispute herein "involves two sophisticated commercial entities, who negotiated and ultimately agreed to a detailed written contract." Brief of Appellant at 34.

**{¶67}** Navistar relies upon *Logsdon v. Graham Ford Co.* (1978), 54 Ohio St.2d 336, 8 O.O.3d 349, 376 N.E.2d 1333, 1336, in support of its contention Dutchmaid presented a "bare case" of intentional fraud and, without more, failed to establish actual malice; therefore, punitive damages were not warranted.

**{¶68}** In *Logsdon,* supra, the defendant, a vehicle dealership, was accused of selling a used garbage packer as a "new unit" to the plaintiff, the owner of a refuse company, and failing to indicate the correct model year of the packer. *Id.* at 336. At the close of the defendant's case, the trial court charged the jury relative to compensatory and punitive damages. *Id.* at 337. After deliberating, the jury found in favor of the plaintiff and awarded compensatory and punitive damages. Id. at 338. The Ohio Supreme Court reversed:

> After studied review of the evidence presented in the trial court, we are of the opinion that Tucci knowingly concealed from appellee a fact material to the transaction, *viz.,* that the garbage packer was approximately one year old, by referring to the new truck and the attached garbage packer as a 'new unit,' and by failing to indicate the model year of the garbage

packer on the retail buyer's order form. However, we conclude that such actions on the part of appellant's salesman did not evince a malicious, wanton or gross fraud, and that therefore the trial court erred in giving the instruction on punitive damages. *Id.* at 340.

**{¶69}** We find *Logsdon*, supra, to be factually distinguishable. The testimony of Navistar's witnesses reveals Navistar's deliberate concealment of the ongoing issues with the MaxxForce 2 trucks. In June or July, 2010, Hebe, Navistar's Vice President of North American Sales, was warned by Navistar engineers the MaxxForce 2 trucks were not ready to launch. Navistar executives opined Navistar did not conduct adequate testing of the final product and the testing conducted was not done in a manner consistent with industry practices. These executives acknowledged their failure to disclose material information and the efforts they made to conceal such information, including the significant problems with the MaxxForce 2 trucks, the inadequate testing, and the short life of the EGR cooler system. Although Navistar's CEO Troy Clarke and COO Jack Allen knew the EGR cooler systems had significant problems and were a primary reason for increased warranty expenses, they concealed this information during an earnings call one month prior to Dutchmaid's purchased of the MaxxForce 2 trucks. Internal documents, including emails, admitted at trial corroborated the testimony.

**{¶70}** The trial court properly instructed the jury on the standard for the imposition of punitive damages. A jury is presumed to follow the instructions of the trial court. *MCM Home Builders, LLC v. Sheehan*, 5th Dist. Delaware No. 18 CAE 09 0074, 2019-Ohio-3899, 2019 WL 4724682, ¶ 48 citing *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d

1313 (1990), paragraph four of the syllabus. This Court will not invade the province of a properly instructed jury which reached a reasonable decision based upon the evidence presented to it. *Estate of Baxter v. Grange Mut. Cas. Co.*, 73 Ohio App.3d 512, 521, 597 N.E.2d 1157 (1992).

{¶71} We conclude the jury reasonably determined Navistar acted with actual malice which warranted an award of punitive damages.  We find there was clear and convincing evidence to supports the jury's determination Navistar acted with actual malice and its conduct was, indeed, egregious.

{¶72}  Appellant's fourth assignment of error is overruled.

{¶73}  The judgment of the Licking County Court of Common Pleas is affirmed.


By: Hoffman, J.
Baldwin, P.J.  and
Wise, Earle, J. concur