[Cite as *MCM Mgt. Corp. v. L&T Equip. Parts, L.L.C.*, 2025-Ohio-3108.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


MCM MANAGEMENT CORP.,                 :

    Appellant,                               :               CASE NO. CA2024-12-089

                                                    :               <u>OPINION AND</u>
    - vs -                                                                    <u>JUDGMENT ENTRY</u>
                                                    :               9/2/2025


L&T EQUIPMENT PARTS, LLC,              :

    Appellee                                  :


CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2023 CVH 00643


McNeal Schick Archibald & Biro Co., LPA, and Brian T. Winchester, for appellant.


# **O P I N I O N**

**HENDRICKSON, P.J.**

{¶ 1} Plaintiff-Appellant, MCM Management Corporation ("MCM"), appeals from a judgment of the Clermont County Court of Common Pleas, which awarded MCM $15,487.67 on its negligent misrepresentation claim against defendant-appellee, L&T Equipment Parts, LLC ("L&T"). For the reasons that follow, we affirm the trial court's

exclusion of damages evidence, reverse the judgment of the trial court because the jury's verdict was against the manifest weight of the evidence, and remand for a new trial.

## I. Factual and Procedural Background

{¶ 2} This appeal arises from a commercial dispute concerning the purchase of used construction equipment parts. MCM is a business specializing in demolition and scrap recovery, or what might be termed "scrap mining," wherein the company demolishes structures and salvages recyclable materials. L&T is a small equipment broker operated by William Smith, who connects customers with equipment parts from third-party suppliers.

{¶ 3} In late 2020, MCM was engaged in the demolition of the Beckjord Plant in Clermont County, Ohio. According to the testimony of Craig Sickmiller, MCM's Chief Financial Officer, the company employed a Caterpillar 375 excavator as "lead equipment" for the project. When this excavator ceased operating, MCM sought replacement tracks to restore it to working condition.

{¶ 4} On December 7, 2020, MCM and L&T executed a contract, memorialized in a spartan invoice, wherein L&T agreed to provide MCM with "complete good used (right and left side) track frames" for the Caterpillar 375 excavator. The contract price was $34,500. MCM had requested and received photographs of the proposed replacement tracks from L&T before agreeing to the purchase.

{¶ 5} L&T, acting as a broker, procured the track frames from a third-party supplier, Trion Equipment Sales, LLC ("Trion"), for $19,500. L&T never physically possessed or inspected the track frames; rather, Trion shipped them directly to MCM's worksite. The track frames arrived at the Beckjord Plant on or about January 11, 2021.

{¶ 6} Upon delivery, MCM discovered that the track frames differed from those depicted in the photographs previously provided. According to MCM, the delivered track frames were unusable because certain bolts were "seized" and parts of the undercarriage had been "torched off" rather than unbolted. In text messages admitted into evidence, Smith acknowledged to Trion that "that was not the set of track frames that were supposed to go to my customer" and that the frames delivered were "not what my customer received."

{¶ 7} MCM attempted to remedy the situation by contacting L&T, who in turn contacted Trion. Trion arranged for someone to inspect the track frames, but according to testimony, this person was denied access to the worksite. A Caterpillar mechanic reportedly examined the track frames but was unsuccessful in making them operational. MCM subsequently spent approximately $61,000 attempting to make the track frames work, and incurred over $171,000 in costs for rental of replacement equipment during the period when the Caterpillar 375 excavator remained inoperable.

{¶ 8} MCM filed suit against L&T, asserting claims for breach of contract, negligent misrepresentation, and conversion. L&T, in turn, filed a third-party complaint against Trion for breach of contract, contribution, and indemnification. The matter proceeded to a jury trial on November 12-14, 2024.

{¶ 9} At trial, the court excluded certain evidence proffered by MCM, including testimony from Sickmiller regarding the reasonableness of repair costs and the impact of the inoperable excavator on overall job costs. The court determined that such testimony constituted expert opinion for which Sickmiller was not qualified.

{¶ 10} Following deliberations, the jury returned a mixed verdict. The jury found in

favor of L&T on MCM's breach-of-contract and conversion claims, but found in favor of MCM on its negligent-misrepresentation claim, awarding damages to MCM of $15,487.67. On the third-party complaint, the jury found in favor of L&T against Trion on the breach-of-contract claim, awarding damages to L&T of $14,987.67.

{¶ 11}  MCM appealed.

## II. Analysis

{¶ 12}  MCM presents four assignments of error challenging the jury verdict as against the manifest weight of the evidence, arguing that the trial court erred in excluding evidence of damages, contending that the jury verdicts were inconsistent, and asserting that cumulative error warrants reversal. L&T did not file a brief. Consequently, we "may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action." App.R. 18(C).

## A. The Weight of the Evidence

{¶ 13}  The first assignment of error alleges:

> THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 14}  MCM's first assignment of error challenges the jury's verdict finding no breach of contract by L&T as against the weight of the evidence. We agree. The evidence presented at trial, when viewed in its totality, compels but one conclusion: L&T breached its contractual obligation to provide MCM with the specific track frames it had agreed to deliver.

{¶ 15}  When reviewing a claim that a verdict is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and

determines whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20; *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment].'" *State v. Harry*, 2008-Ohio-6380, ¶ 45, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1993).

{¶ 16} The threshold issue in evaluating whether L&T breached its contract with MCM requires determining what specific performance obligations L&T undertook. The evidence establishes that L&T's contractual duties extended beyond the bare terms of the invoice to encompass delivery of the particular track frames whose availability was the inducement for MCM's agreement to purchase.

{¶ 17} Under Ohio law, the parol evidence rule prohibits the admission of extrinsic evidence to contradict, vary, or supplement the terms of a complete and unambiguous written contract. *Galmish v. Cicchini*, 2000-Ohio-7, ¶ 17. But this rule applies only to fully integrated contracts, those intended by the parties as a complete and exclusive statement of their agreement: "'When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'" *Ed Schory & Sons, Inc. v. Francis*, 1996-Ohio-194, ¶ 28, quoting 3 Corbin, *Corbin on Contracts*, § 573, at 357 (1960).

{¶ 18} Evidence of the specific inducement that led a party to enter a contract does not vary or contradict written terms under the parol evidence rule. The Ohio Supreme

Court has said that "[a] party may . . . proffer evidence of a contemporaneous oral agreement when the agreement was made in order to induce a party to enter into a written contract." *Walters v. First Nat. Bank of Newark*, 69 Ohio St.2d 677, 681 (1982). This court and other Ohio courts have recognized this principle. *See Hamilton Brownfields Redevelopment, LLC v. Duro Tire & Wheel*, 2004-Ohio-1365, ¶ 18 (12th Dist.); *see, e.g., Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 2021-Ohio-1425, ¶ 39 (5th Dist.). As the *Navistar* court explained, "there is a distinct difference between prohibiting prior or contemporaneous agreements to vary the terms of a written contract versus prohibiting prior or contemporaneous statements to induce a party into entering into the contract." *Navistar* at ¶ 39.

{¶ 19} In *Hamilton Brownfields*, this court permitted evidence of inducement, noting that such evidence "was not introduced to vary or contradict the terms of the lease" but rather "was introduced for the purpose of demonstrating that Hamilton Brownfields made inducements to Duro to enter into the lease." *Hamilton Brownfields* at ¶ 19. We recognized that "'the parol evidence rule precludes the introduction of evidence of conversations or declarations which occur prior to or contemporaneous with a written contract and *which attempt to vary or contradict terms contained in the writing*.'" (Emphasis sic.) *Id.* at ¶ 18, quoting *AmeriTrust Co. v. Murray*, 20 Ohio App.3d 333, 335 (8th Dist. 1984). But a party may "'proffer evidence of a contemporaneous oral agreement when the agreement was made in order to induce a party to enter into a written contract.'" *Id.*, quoting *Walters* at 681. In short, rather than varying contract terms, such evidence establishes what the parties actually bargained for.

{¶ 20} The distinction between evidence that impermissibly varies written terms

and evidence that establishes contractual inducement is crucial. When a seller represents that specific goods are available and uses those representations to induce a buyer's agreement, the availability and delivery of those particular goods becomes part of the consideration the buyer bargained to receive. The *Navistar* court applied this principle where the buyer "would not have purchased MaxxForce 2 trucks had it known" certain undisclosed facts, finding that "because Navistar's representations to the contrary and nondisclosures induced Dutchmaid to purchase the MaxxForce 2 trucks, we find the evidence as to these nondisclosures is not prohibited by the parol evidence rule." *Navistar* at ¶ 39.

{¶ 21} The evidence here overwhelmingly establishes that L&T's photographic representations of specific track frames constituted the primary inducement for MCM's decision to enter the contract. MCM's witnesses testified that these photographs were requested specifically to determine what products were available and that MCM's agreement to purchase was contingent upon receiving the particular track frames depicted.

{¶ 22} L&T's owner, William Smith, acknowledged that MCM "requested pictures on what they were purchasing" and that such requests were "an accepted method of purchasing equipment in the industry." This testimony demonstrates that the photographs served not as mere preliminary negotiations but as concrete representations of what L&T had available to deliver. Smith further testified that the industry practice of providing photographs creates reasonable expectations about what will be delivered, transforming these visual representations from negotiation aids into specific commitments about available inventory.

{¶ 23} The photographs of the track frames, which L&T obtained from Trion and forwarded to MCM at MCM's specific request, constituted L&T's representation that these particular goods were available for delivery. MCM's reliance on these photographs in deciding to purchase was both reasonable and foreseeable. Indeed, the evidence established that MCM would not have agreed to purchase track frames without first seeing what was available, making the photographic representations a condition precedent to contract formation.

{¶ 24} The testimonial evidence overwhelmingly demonstrates that L&T failed to deliver the specific track frames whose availability induced MCM's agreement to purchase. Witnesses testified that the delivered products materially differed from those shown in the photographs that L&T had used to induce the contract. This testimony was largely uncontradicted and established a clear breach of L&T's fundamental obligation.

{¶ 25} L&T acknowledged that what it shipped to MCM was not what was depicted in the photographs it had used to secure MCM's agreement. Text messages from Smith to Trion stated: "You know that that was not the set of track frames that were supposed to go to my customer. They were supposed to be the ones that were already off the machine that I received pictures of." When asked directly whether "the tracks weren't what was ordered," Smith testified unequivocally: "That's exactly what I told Trion."

{¶ 26} Smith's attempt to justify this substitution by claiming Trion told him the delivered tracks were "as good or better" than those photographed cannot cure the fundamental breach. The contract was induced by representations of specific available goods, not by promises to deliver whatever L&T or its supplier deemed equivalent.

{¶ 27} The jury's verdict defies the logic of the evidence presented. The jury's twin

findings, that Trion breached its contract to provide conforming goods to L&T while L&T somehow did not breach its obligation to provide those same inducing goods to MCM, cannot be reconciled with any reasonable view of the evidence.

{¶ 28} The testimony established that L&T contracted with Trion specifically to obtain the track frames shown in the photographs that had induced MCM's agreement. When the jury found Trion breached by failing to provide those particular goods, it necessarily found that L&T could not deliver what had induced MCM to contract. No evidence suggested L&T obtained the specific track frames from another source or that MCM received the particular goods whose availability had induced the original agreement.

{¶ 29} L&T's status as a broker provides no defense to its failure to deliver the goods whose availability induced MCM's contract. When L&T represented that specific track frames were available and used those representations to secure MCM's agreement, it assumed the obligation to deliver those particular goods. A party cannot escape liability for breach by claiming its own supplier failed to perform, absent specific contractual language allocating that risk to the buyer.

{¶ 30} Examining the trial record in its entirety, the evidence establishes that L&T breached its contract with MCM by failing to deliver the specific track frames whose availability had induced MCM's agreement to purchase. The jury's contrary verdict represents precisely the type of manifest miscarriage of justice that appellate review exists to correct.

{¶ 31} We therefore conclude that the jury's verdict on the breach-of-contract claim is against the manifest weight of the evidence. No reasonable jury, properly considering

L&T's admissions, the documentary evidence, and the inherent logic of its own verdict finding Trion's breach, could have found that L&T fulfilled its contractual obligations to MCM. Accordingly, this case must be remanded for a new trial. App.R. 12(C)(2); *Eastley*, 2012-Ohio-2179, at ¶ 22.

{¶ 32} The first assignment of error is sustained.

### B. Evidence of Damages

{¶ 33} The second assignment of error alleges:

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN EXCLUDING PLAINTIFF'S EVIDENCE OF DAMAGES.

{¶ 34} In its second assignment of error, MCM argues that the trial court erred and abused its discretion in excluding plaintiff's evidence of damages. Specifically, MCM contends that the trial court improperly excluded the testimony of its chief financial officer, Craig Sickmiller, regarding the reasonableness of repair costs and the overall impact of the inoperative equipment on the construction project. MCM maintains that such testimony was admissible as lay opinion testimony under Evid.R. 701.

{¶ 35} "'A trial court has considerable discretion in admitting the opinion testimony of lay witnesses.'" (Citation omitted.) *State v. Speis*, 2023-Ohio-1422, ¶ 30 (12th Dist.), quoting *State v. Marshall*, 2010-Ohio-5160, ¶ 43 (2d Dist.). "An appellate court will not disturb a decision of the trial court to admit or exclude evidence absent a clear and prejudicial abuse of discretion." (Citation omitted.) *Donlon v. Lineback*, 2016-Ohio-7739, ¶ 32 (12th Dist.).

{¶ 36} Evid.R. 701 governs opinion testimony by lay witnesses and provides that such testimony "is limited to those opinions or inferences which are (1) rationally based

on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." The rule requires that lay opinion testimony be "rationally based on the perception of the witness. Perception connotes sense: visual, auditory, olfactory, etc. Thus, opinion testimony under Evid. R. 701 must be based on firsthand, sensory based knowledge." *Security National Bank & Trust Co. v. Reynolds*, 2008-Ohio-4145, ¶ 17 (2d Dist.).

{¶ 37} "The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw." *Id.* at ¶ 19. However, as recognized by the Supreme Court, courts have permitted lay witnesses to express opinions in areas where expert testimony might ordinarily be expected, provided that the testimony "still fall[s] within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue." *State v. McKee*, 2001-Ohio-41, ¶ 13. Such cases are "not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience." *Id*.

{¶ 38} The record reveals that the trial court excluded two categories of testimony from Sickmiller: his opinion on the reasonableness of repair costs reflected in Exhibit 9, which pertinently includes an invoice from a company showing that MCM purchased just under $30,000 worth of parts to try and get these tracks to work, and Exhibit 10, an invoice for a little over $31,000 from a welding company for work on the replacement tracks from L&T, and his opinion that the inoperative equipment caused a 10 percent increase in overall project costs.

**1. Opinion on Reasonableness of Repair Costs**

{¶ 39} MCM sought to have Sickmiller testify that the repair costs reflected in Exhibits 9 and 10, totaling approximately $61,000, were reasonable based on his experience in the construction and demolition field. The trial court initially sustained an objection for lack of foundation, and after MCM attempted to establish Sickmiller's background in "heavy contracting" since 1991, the court continued to sustain objections to this line of questioning.

{¶ 40} The transcript reveals that Sickmiller possessed considerable personal knowledge regarding the costs incurred by MCM. As the company's CFO with "direct job involvement," Sickmiller testified that he tracked job costs as part of his duties and had personal knowledge of the matters at hand. He also had experience in construction schedules and costs, visited the worksite approximately three times per month, and possessed general industry knowledge and experience with construction costs and scheduling.

{¶ 41} When asked about typical costs for repairs of equipment, Sickmiller testified that he had been in "heavy contracting" since 1991 and was familiar with typical costs for equipment repairs. The trial court, however, sustained objections to his testimony about whether costs reflected in Exhibits 9 and 10—approximately $61,000 in repair attempts—were reasonable. Similarly, when asked to quantify the impact on costs resulting from issues with the Caterpillar 375, objections were again sustained. The trial court said that this matter "calls for an expert opinion."

{¶ 42} The trial court's ruling was well within its discretion. While Sickmiller possessed general experience in the construction industry and served as MCM's CFO,

the record fails to establish that he possessed sufficient specialized knowledge or experience to render an opinion on the reasonableness of specific repair costs for construction equipment. The court properly recognized that establishing the "reasonableness" of costs requires more than general industry experience, particularly when the witness's role as CFO does not necessarily encompass technical expertise in equipment repair pricing.

{¶ 43} Defense counsel's analogy during sidebar argument was apt: "I have direct patient involvement and I can't testify whether a hospital bill is reasonable and necessary." Similarly, Sickmiller's position as CFO and general construction experience, without more specific foundation regarding his competence to evaluate the reasonableness of equipment repair costs, was insufficient to support the admission of such opinion testimony.

## 2. Opinion on Project Cost Impact

{¶ 44} The trial court also properly excluded Sickmiller's testimony that the inoperative equipment caused a 10 percent increase in overall project costs, amounting to approximately $476,000. During the examination, when Sickmiller attempted to testify about this figure, the trial court sustained objections and conducted a sidebar conference to address the foundation for such testimony.

{¶ 45} The court's concerns were well-founded. Sickmiller's proposed testimony that the inoperative equipment was responsible for 10 percent of the project's increased costs lacked the necessary foundation to satisfy Evid.R. 701's requirements. The court noted the logical inconsistency in claiming that the machine was responsible for 10 percent of the project costs when rental replacement equipment costs were already being

separately claimed as damages.

{¶ 46} The court's ruling properly recognized that Sickmiller's proposed testimony was speculative rather than based on firsthand observations and personal knowledge. While Sickmiller undoubtedly had knowledge of the project's overall costs and the challenges caused by the inoperative equipment, his conclusion that this specific equipment failure caused precisely 10 percent of the project's cost increases required analytical reasoning that extended beyond lay opinion testimony into the realm of expert opinion.

{¶ 47} The trial court's exclusion of the challenged testimony demonstrates a reasoned application of Evid.R. 701's requirements. The court allowed Sickmiller to testify extensively about his personal knowledge of the project, the equipment failure, the costs incurred for rental replacement equipment, and the impact on the project timeline. But the court properly drew the line at permitting testimony that required specialized knowledge or analytical conclusions not sufficiently grounded in firsthand observations.

{¶ 48} Even assuming that the trial court's exclusion of some testimony was error, such error was harmless. The record reflects that Sickmiller was permitted to testify about substantial damages, including the costs reflected in Exhibits 9 and 10 themselves, the rental replacement equipment costs exceeding $171,000, and the general impact of the equipment failure on the project. The jury was presented with sufficient evidence to assess MCM's damages, as evidenced by the verdict awarding $15,487.67 on the negligent misrepresentation claim.

{¶ 49} The excluded testimony, while potentially supportive of MCM's damages claims, was not essential to establishing the basic elements of damages. The court's

limitation of Sickmiller's testimony to matters within his personal knowledge and experience, while excluding more speculative conclusions, reflects proper application of Evid.R. 701 and does not constitute an abuse of discretion.

{¶ 50} The trial court's exclusion of portions of Sickmiller's testimony was a measured and appropriate exercise of its discretionary authority to ensure that lay opinion testimony complies with Evid.R. 701's requirements. The court properly distinguished between testimony based on firsthand knowledge and experience, which was admitted, and testimony requiring specialized analytical conclusions, which was excluded. The court's application of evidentiary rules does not constitute an abuse of discretion.

{¶ 51} The second assignment of error is overruled.

### C. Inconsistency of Verdicts and Cumulative Error

{¶ 52} The third assignment of error alleges:

THE JURY VERDICTS ARE INCONSISTENT.

{¶ 53} The fourth assignment of error alleges:

THE CUMULATIVE ERROR IN THIS MATTER WARRANTS
REVERSAL OF THE JURY'S VERDICT AND REMAND FOR
A NEW TRIAL.

{¶ 54} We have determined that the jury verdict is against the weight of the evidence and that the case must be remanded for a new trial. Consequently, issues related to the inconsistency of jury verdicts and cumulative error are moot and need not be addressed.

### III. Conclusion

{¶ 55} We have sustained the first assignment of error, having determined that the jury verdict is against the weight of the evidence. The trial court's judgment is reversed to

the extent the jury's verdict was against the manifest weight of evidence, affirmed with regard to the exclusion of damages evidence, and this case is remanded for a new trial consistent with this opinion.

M. POWELL and SIEBERT, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, reversed and this cause is remanded for a new trial and further proceedings according to law and consistent with the Opinion filed the same date as this Judgment Entry. In all other respects, the judgment of the trial court is affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 50% to appellant and 50% to appellee.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge